1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| DIAMOND X RANCH LLC,, | Case No. 3:13-cv-00570-MMD-WGC |
| Plaintiff, | ORDER |
| v. | (Motions to Dismiss - ECF Nos. 144, 182) |
| ATLANTIC RICHFIELD COMPANY, | |
| Defendants. | |

## I.   SUMMARY

This case arises from the alleged contamination of Plaintiff Diamond X Ranch LLC's ("Diamond X") property by drainage from the Leviathan Mine in Alpine County, California ("the Mine"). Defendant Atlantic Richfield Company ("ARCO") asserts counterclaims and third-party claims. Before the Court are Diamond X's motion to dismiss ("Diamond X's Motion") and Third-Party Defendant Park Livestock Company's motion to dismiss ("PLC's Motion"). (ECF Nos. 144, 182.) The Court has reviewed the briefs related to these motions and supplemental briefs related to Diamond X's Motion. (ECF Nos. 155, 160, 185, 193, 212, 215.) The Court also heard argument on July 18, 2016. For the reasons discussed below, the Motions are denied.

## II.   BACKGROUND

Diamond X owns more than 1700 acres of property in Douglas County, Nevada, and Alpine County, California ("the Property"). (ECF No. 175 at 7.) Plaintiff alleges that the Property has been contaminated by acid mine drainage ("AMD") flowing from the Mine. (*Id.* at 3-8.) Between 1953 and 1962, The Anaconda Company, Defendant's

wholly-owned subsidiary, owned and operated the Mine as an open-pit sulfur mine. (*Id.* at 3.) No entity has operated the Mine since 1962. (*Id.*)

In 1997, the United States Environmental Protection Agency ("EPA") began to take action at the Mine under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). (*Id.* at 3-4.) The EPA listed the Mine on the National Priorities List in May 2000, and it identified ARCO and the State of California as potentially responsible parties ("PRPs"). (*Id.* at 4.) The EPA issued a Unilateral Administrative Order ("UAO") against ARCO in November 2000 ("2000 UAO") and a second UAO against ARCO in June 2008 ("2008 UAO") (collectively "UAOs"). (ECF No. 144 at 3; ECF No. 146 at Exhs. 1 and 2.[1]) The UAOs again identified ARCO as a PRP and required ARCO to initiate a Remedial Investigation and Feasibility Study ("RI/FS") of contamination from the Mine and to prepare and perform a RI/FS based on a Statement of Work ("SOW"). (ECF No. 144 at 4; ECF No. 146 at 5, 57.) The purposes of the UAOs were (1) to determine the nature and scope of contamination from the site and its threat to public health and the environment, and (2) to determine and evaluate alternatives to effectively remediate the contamination through a feasibility study (ECF No. 146 at 6, 58.) Under the SOW, ARCO was required to conduct a "phased" evaluation to determine the available remedial approaches and to then compile this information into a report. (*Id.* at 100.)

Plaintiff asserts that the open-pit mining and releases of AMD at the Mine has contaminated the Property as well as Bryant Creek,[2] a tributary downstream of the Mine which provides water for flood irrigation on the Property. (ECF No. 175 at 7-8.) Diamond X alleges that the release of hazardous substances from the Mine have caused it to incur response costs as defined under CERCLA section 9601(25). (*Id.* at 14.) Diamond

---

[1]  Diamond X requests the Court to take judicial notice of the UAOs and the Alpine Decree.  (ECF No. 146.)  PLC similarly asks the Court to take judicial notice of these documents along with a Special Use Application and Report.  (ECF No. 184.) The Court grants both requests as these documents are matters of public record.

[2] Plaintiff is the only entity that has water rights on Bryant Creek.  (ECF No. 119 at 8.)

X asserts eight claims against ARCO, including a claim for recovery of its response costs under CERCLA section 107(a), 42 U.S.C. § 9607(a) ("Section 107(a)" or "§ 107(a)"). (*Id.*)

In response, ARCO asserts two counterclaims against Diamond X, which function as third-party claims against PLC, under CERCLA sections 107(a) and 113(f)(1) ("Section 113(f)(1)" or "§ 113(f)(1)"). (ECF No. 179 at 26-29.) ARCO also asserts a counterclaim/third-party claim against Diamond X and PLC for declaratory relief under CERCLA section 113(g)(2) and 28 U.S.C. § 2201. (ECF No. 179 at 30.) The gist of ARCO's allegations are that Diamond X and PLC (collectively, "Third-Party Defendants") actively operated the irrigation system on the Property, including determining "if, when, where and how much water containing hazardous substances was placed and deposited on the Diamond X Property." (*Id.* at 21.) ARCO further alleges that the Third-Party Defendants undertook maintenance activities related to the irrigation ditches "with the intent to dispose of the sediment and hazardous substances on the Diamond X Property and on other properties." (*Id.* at 22.)

Diamond X moves to dismiss ARCO's first claim under Section 107(a) and third claim for declaratory relief to the extent it is based on CERCLA section 113(g)(2).[3] (ECF No. 144.) PLC also seeks dismissal of the third-party claims, contending that it is not a covered party under CERCLA, and adopts the same arguments raised in Diamond X's Motion in the alternative. (ECF No. 182.)

## III.   LEGAL STANDARD

A court may dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic*

---

[3] Diamond X and PLC also moved to strike the portion of the declaratory relief claim that is based on CERCLA section 113(g)(2) if the Court grants their motions to dismiss. (ECF Nos. 145, 183.) The Court denied these motions. (ECF No. 216.)

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In *Iqbal*, the Supreme Court clarified the two-step approach that district courts are to apply when considering motions to dismiss. First, a district court must accept as true all well-pleaded factual allegations in the complaint; however, legal conclusions are not entitled to an assumption of truth. *Id.* at 678-79. Second, a district court must consider whether the factual allegations in the complaint allege a plausible claim for relief. *Id.* at 679. A claim is facially plausible when the plaintiff's complaint alleges facts that allow a court to draw a reasonable inference that the defendant is liable for the alleged misconduct. *Id.* at 663. Where the complaint fails to "permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)) (alteration omitted). When the claims in a complaint have not crossed the line from conceivable to plausible, the complaint must be dismissed. *Twombly*, 550 U.S. at 570. A complaint must contain either direct or inferential allegations concerning "all the material elements necessary to sustain recovery under *some* viable legal theory." *Id.* at 562 (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)).

## IV.   DIAMOND X'S MOTION

Diamond X argues that ARCO is barred from asserting a claim under Section 107(a) because of Diamond X's own Section 107(a) claim and because ARCO's response costs were incurred pursuant to the EPA's administrative orders, which amount to "civil actions."[4] (ECF No. 144 at 10.) The Court will address each argument in turn.

### A.   ARCO's Section 107(a) Claim

"CERCLA provides two mechanisms for private parties to recover their environmental cleanup expenses from other parties." *Whittaker Corp. v. United States* (*Whittaker II*), No. 14-55385, 2016 WL 3244838, at *3 (9th Cir. June 13, 2016). First,

---

[4] Diamond X further argues that if the Court dismisses ARCO's Section 107(a) claim, the Court should dismiss ARCO's declaratory relief claim. (ECF No. 144 at 11.)

Section 107(a) provides for parties to bring "cost recovery" actions against "potentially responsible parties" to recover costs, including "any . . . necessary costs of response incurred by any other person consistent with the national contingency plan."  42 U.S.C. § 9607(a); *Whittaker II*, 2016 WL 3244838, at *3. Second, "[s]ection 113(f)(1) authorizes a contribution action to [PRPs] with common liability stemming from an action instituted under § 106 or § 107(a)." *United States v. Atlantic Research Corp.* ("*Atlantic II*"), 551 U.S. 128, 129 (2007). Sections 107(a) and 113(f) "complement each other by providing causes of actions to persons in different procedural requirements." *Id.* at 139 (internal quotation marks omitted). "A party uses contribution to get reimbursed for being made to pay more than its fair share to someone else, and uses cost recovery to get reimbursed for its own voluntary cleanup costs." *Whittaker II*, 2016 WL 3244838, at *4. Moreover, while PRPs can seek contribution under § 113(f)(1), they cannot simultaneously seek double recovery under § 107(a). *Atlantic II*, 551 U.S. at 139. "[A] party who *may* bring a contribution action for certain expenses *must* use the contribution action, even if a cost recovery action would otherwise be available." *Whittaker II*, 2016 WL 3244838, at *4 (citing *Atlantic II*, 551 U.S. 128; *Kotrous v. Goss-Jewett Co. of N. Cal.*, 523 F.3d 924, 933 (9th Cir. 2008)).

Diamond X asserts a claim under § 107(a) to recover clean-up costs on the Property in response to hazardous waste released from the Mine.[5] (ECF No. 175 at 14.) Diamond X argues that ARCO's remedy is limited to contribution under Section 113(f)(1) and that ARCO cannot counterclaim under § 107(a).  (ECF No. 175.) ARCO counters that it is seeking to recover separate costs under §§ 107(a) and 113(f), such that counterclaiming under both sections is proper. (ECF No. 179.)

Diamond X relies primarily on *Whittaker Corp. v. United States* (*Whittaker I*), No. CV 13-1741 FMO, 2014 WL 631113 (C.D. Cal. Feb. 10, 2014) to argue that ARCO

---

[5] Diamond X also alleges a claim for declaratory relief under Section 113(g)(2) seeking to ensure ARCO pays for Diamond X's future remediation costs. (ECF No. 175 at 13.)

could only bring a § 113(f)(1) counterclaim. In June, the Ninth Circuit reversed *Whittaker I*, finding that Whittaker could bring a claim under § 107(a). *See Whittaker II*, 2016 WL 3244838. The parties disagree as to the import of *Whittaker II* on ARCO's § 107(a) claim. The Court agrees with ARCO on this matter.

In *Whittaker II,* the Ninth Circuit addressed the issue of whether Whittaker was limited to a contribution action against other polluters or whether instead Whittaker could seek a cost recovery action under § 107(a). Whittaker settled prior claims that Castaic Lake Water Agency ("Castaic Lake") had asserted under CERCLA in 2007. *See Whittaker II*, 2016 WL 3244838, at *2. In the settlement, Whittaker reimbursed Castaic Lake for the costs to remove perchlorate pollution from its water well sites and for purchased water costs. *Id.* at 2. The agreement settled costs between Whittaker and Castaic Lake, but it did not require Whittaker to clean up the source of the contamination at the Bermite Site. *Id.* In 2013, Whittaker sued the United States to recover expenses associated with remediating the Bermite Site under § 107. *Id.* In *Whittaker I*, the district court dismissed Whittaker's § 107(a) claim, holding that Whittaker's claim needed to be brought under § 113(f)(1). *See Whittaker I*, 2014 WL 631113, at *11.

The Ninth Circuit reversed, reasoning that Whittaker was now seeking to recover "a different set of expenses [ ] for which Whittaker was not found liable" under the settlement agreement with Castaic Lake. *See Whittaker II*, 2016 WL 3244838, at *8. The court rejected the government's argument that a party who has been sued in a § 107 cost recovery action for expenses related to pollution at a site should be limited to a contribution action for all of their expenses at that site. *Id.* Thus, the court held that Whittaker was not required to bring a claim for contribution under §113(f)(1) against the government because it is seeking § 107(a) claim "to recover expenses that are separate from those for which Whittaker's liability is established or pending." *Id.* at *9.

Similarly here, ARCO alleges that its counterclaim seeks to recover costs that are separate from those that Diamond X seeks to recover in its § 107(a) claim. ARCO's

operative pleadings allege as follows with respect to its § 107(a) claim:

45. Atlantic Richfield has incurred, and will continue to incur in the future, necessary response costs to, among other things, investigate, evaluate, and remediate the contamination allegedly associated with the Leviathan Mine site, including the Diamond X Property, in a manner consistent with the NCP, 40 C.F.R. Part 300 *et seq.*

46. Diamond X and Park Livestock are liable to Atlantic Richfield under CERCLA section 107(a), 42 U.S.C. § 9607(a), for response costs incurred by Atlantic Richfield in connection with the Diamond X Property.

47. Atlantic Richfield has not otherwise brought, or been sued in, a civil action under CERCLA sections 106 or 107(a) for the response costs it has incurred or will incur in connection with the Diamond X Property.

(ECF No. 179 at 28.) ARCO contends, and Third-Party Defendants do not dispute, that ARCO's § 107(a) claim seeks to recover (1) costs outside of Diamond X's claim, (2) costs from other parties (i.e., PLC), (3) costs ARCO "has itself incurred," and (4) costs incurred under the UAOs related to the Property. (ECF No. 155 at 7.)

"Not all of a party's expenses related to remediating a site fall within the scope of contribution." *Whittaker II*, 2016 WL 3244838, at *5. Accepting ARCO's allegations as true, which the Court must under Rule 12(b)(6), ARCO has incurred expenses that are outside the scope of contribution and the scope of Diamond X's Section 107(a) claim for which liability has not been established. ARCO is therefore not barred from seeking cost recovery under Section 107(a).

## B. The EPA's Orders

Under CERCLA, PRPs can seek contribution from any other person "who is liable or potentially liable under [§ 107(a)] of this title, *during or following any civil action under [§ 106]* of this title or under [§ 107(a)] of this title." 42 U.S.C. § 9613(f)(1) (emphasis added). Diamond X reasons that because the UAOs amount to a "civil action," ARCO's procedural circumstances preclude it from asserting a claim under

Section 107(a).  Diamond X relies primarily on *U.S. v. Atlantic Research Corporation* (*Atlantic II*), 551 U.S. 128, and *PCS Nitrogen, Inc. v. Ross Development Corporation,* 104 F.Supp.3d 729 D.S.C. 2015). (ECF No. 144 at 9-10.) ARCO responds that Diamond X's argument is not supported by the majority of courts who have considered this issue. (ECF No. 155 at 10-11.)

As an initial matter, the Court disagrees with Diamond X's interpretation of *Atlantic II,* which Diamond X relies upon to argue that "enforcement actions," such as UAOs, are civil actions. (ECF No. 144 at 9; ECF No. 160 at 7-8.) Diamond X cites to the Supreme Court holding that PRPs who "have been subject to §§ 106 or 107 *enforcement actions* are still required to use § 113, thereby ensuring its continued vitality." *See Atlantic II*, 551 U.S. at 134 (quoting *Atlantic Research Corp. v. United States* ("*Atlantic I*"), 459 F.3d 827, 836-37 (8th Cir. 2006)) (emphasis added). Although Diamond X notes the conflicting interpretations of this statement, it asserts this is persuasive authority regarding whether the EPA's UAOs amount to a "civil action" pursuant to § 113(f)(1). (ECF No. 160 at 7 n. 5.) While the quoted statement appears to include UAOs as "civil actions" under § 113(f)(1), this conclusion ignores the case's procedural posture. In that case, Atlantic Research had "commenced suit [against the United States] before, rather than during or following, a CERCLA enforcement action." *Atlantic I*, 459 F.3d at 835 (internal quotation marks omitted). Atlantic Research thus could not bring a § 113(f) action but instead had to rely on a § 107 claim to recover its cleanup costs. *Id.* In this context, "enforcement action" appears synonymous with CERCLA claims under §§ 106 or 107 because the court was not evaluating a previous administrative order or action. Since Atlantic Research sued the United States prior to any CERCLA enforcement action, the case never addressed what constitutes a § 106(a) civil action.

Diamond X relies on *PCS Nitrogen* as well, but that case reflects the minority view that a UAO is equivalent to a "civil action" under § 113(f)(1). *See PCS Nitrogen*, 104 F. Supp. 3d at 742 (stating that "at least one district court, however, considered a

UAO to be a civil action under § 113(f)(1)").[6] In contrast, the majority of courts have held that UAOs under § 106(a) do not constitute a "civil action" for the purposes of § 113(f)(1). *See Emhart Industries, Inc. v. New Eng. Container Co., Inc.*, 478 F. Supp. 2d 199, 203 (D.R.I. 2007) (stating that the "court will follow the majority of courts in concluding that § 113(f)(1) is unavailable for parties who are merely subject to administrative orders, as opposed to final consent decrees, judgments, or apportionments of liability") (internal quotation marks omitted); *Raytheon Aircraft Co. v. United States*, 435 F. Supp. 2d 1136, 1142 (D. Kan. 2006) (holding that a UAO pursuant to § 106 was not a "civil action" for the purposes of a § 113(f)(1) claim for contribution); *Blue Tee Corp. v. ASARCO, Inc.*, No. 03-5011-CV-SW-F-JG, 2005 WL 1532955, at *4-5 (W.D. Mo. June 27, 2005) (dismissing a § 113(f)(1) contribution claim because a UAO was not a "civil action" under §§ 106 or 107); *United States v. Taylor*, 909 F. Supp. 355, 365 (M.D.N.C. 1995) (stating a PRP which conducts remediation cannot bring a contribution action when it has been "subjected to a [§] 106 administrative order");  *In re FV Steel & Wire Co.*, 331 B.R. 385 (Bankr. E.D. Wis. 2005) (finding administrative orders do not qualify as a "civil action" under CERCLA); *Pharmacia Corp. v. Clayton Chemical Acquisition LLC*, 382 F. Supp. 2d 1079, 1088-89 (S.D. Ill. 2005) (holding neither a UAO nor an Administrative Order by Consent ("AOC") qualified as a "civil action" under § 113(f)(1)).  The Court agrees with these courts.

For civil actions in the Ninth Circuit, a final judgement "ends the litigation on the merits and leaves nothing for the court to do but execute the judgement." *Williamson v. UNUM Life Ins. Co. of Am.*, 160 F.3d 1247, 1250 (9th Cir. 1998) (citations and internal quotation marks omitted). However, the UAOs at issue here do not share the same characteristics as a "civil action" in terms of scope, finality, and opportunity to appeal.

Several aspects of the UAOs suggest that they lack the scope and finality of a

---

[6] The *PCS Nitrogen* court appears to only briefly discuss this issue in concluding that "PCS has nonetheless met one of the statutory triggers for a § 113(f)(1) claim because it brings the instant action following a civil action under § 107(a)[.]" *PCS Nitrogen*, 104 F. Supp. 3d at 743.

"civil action." The UAOs' phased RI/FS study, requiring ongoing evaluations by the EPA and ARCO to determine the final remediation plan, does not have the same definitive scope or finality as a judgment in a "civil action." While the EPA would eventually use the RI/FS report to determine the extent of ARCO's remediation work, this process appears more incremental and less finalized than a "civil action." The EPA's explicit reservation of right in the UAOs to bring action against ARCO pursuant to § 107 for additional response costs, or to require ARCO to conduct additional cleanup under § 106, suggests that the UAOs cannot be considered a final judgment. (*See* ECF No. 146 at 83.) The 2008 UAO was filed after ARCO apparently failed to comply with the 2000 UAO, further suggesting that a UAO does not have the finality of a "civil action." Under the 2008 UAO, the EPA provided that they could unilaterally carry out the order or seek judicial enforcement of the order under § 106, which further shows that the UAOs do not share the characteristic of finality found in "civil actions." (*Id.* at 84.) Since the UAOs did not settle ARCO's liability with respect to the site or determine a final course of action for the cleanup, the UAOs cannot be considered to have the same preclusive effect as a judgment in a "civil action." Thus, the UAOs do not appear to have the same scope or finality as a "civil action."

The UAOs do not provide the same appellate rights commensurate with a "civil action." The 2000 UAO gave ARCO an opportunity to confer with the EPA within 10 days of signing the order. (*Id.* at 85.) But it required that "[t]he purpose and scope of the conference shall be limited to issues involving the implementation of the response actions required by this Order and the extent to which [ARCO] intends to comply with this Order." (*Id.*) This conference was not a proceeding that allowed ARCO to present evidence to challenge the order. (*Id.*) And ARCO was prohibited from seeking review of the order or resolution of its potential liability. (*Id.*) ARCO was also given 20 days from the effective date of the order to give the EPA written notice of its compliance. (*Id.* at 70.) While ARCO had the opportunity to present facts and defenses under §§ 106(b) and 107(c)(3) during this time, after the deadline passed ARCO had to unequivocally

commit to perform the order or be considered in violation of the UAO. (*Id.*) These limited opportunities to contest the UAOs can hardly be considered appeals analogous to those available for "civil actions." *See* Fed. R. App. P. 3. As a result, ARCO had no meaningful way to present defenses that would either modify the UAOs or absolve ARCO of liability, which are procedural measures that would be available to a defendant in a "civil action."

In addition, the trigger for the three-year statute of limitations as applied to § 113(f)(1) claims counsels against finding a UAO to equate to a "civil action." Section 113(g)(3) provides that the statute of limitations for contribution actions begin at the date of "judgment" and the date of "settlement." *Cooper Indus., Inc. v. Aviall Services, Inc.,* 543 U.S. 157, 158-59 (2004). As the Supreme Court observed in *Cooper Industries*, "[N]otably absent from § 113(g)(3) is any provision for starting the limitations period if a judgment or settlement never occurs, as is the case with a purely voluntary cleanup[,]" or, plausibly, administrative orders. *See id.* at 167. This observation lends support to a finding that a § 113(f)(1) claim is prohibited absent a lawsuit or settlement under §§ 106 or 107. See *Blue Tee*, 2005 WL 1532955, at *4 (" . . . it is clear a party can pursue contribution under § 113(f)(1) only after being sued in a § 106 or § 107 civil action . . . "); *see also Am. Premier Underwriters Inc. v. Gen. Elec. Co.*, 866 F. Supp. 2d 883, 905 (S.D. Ohio 2012) ("[T]he Court concludes that the 1996 UAO did not trigger the statute of limitations for [the plaintiff's] contribution claim.").

Finally, the ongoing nature of a UAO reveals a reason for having § 113(g)(3) start the statute of limitations at the date of "judgment" or "settlement" instead of the effective date of the order. *See Cooper Indus.,* 543 U.S. at 158-59; *see, e.g.*, *Am. Premier Underwriters*, 866 F. Supp. 2d at 905; *Taylor*, 909 F. Supp. at 365 (stating that a party busy incurring additional cleanup costs needs a longer statute of limitations for its recovery action than a party seeking a contribution claim to recuperate its fixed costs).

In sum, the Court finds that the EPA's administrative orders such as the UAOs are not "civil actions" under § 106(a).

## V.    PLC'S MOTION

"The remedy that Congress felt it needed in CERCLA is sweeping: *everyone* who is potentially responsible for hazardous-waste contamination may be forced to contribute to the costs of cleanup." *United States v. Bestfoods*, 524 U.S. 51, 56 n. 1 (1998) (quoting *Pennsylvania v. Union Gas*, 491 U.S. 1, 20 (1989)). Potentially responsible parties under CERCLA fall into "four classes of persons": current owner or operator; former owner or operator; arranger; and transporter. *Kaiser Aluminum & Chem. Corp. v. Catellus Dev. Corp.*, 976 F.2d 1338, 1340-41 (9th Cir. 1992); 42 U.S.C. § 9607(a).[7] "[L]iability attaches . . . because . . . their actions contribute to the release of contaminated material and increase the cost of remedial action." *Id.* at 1343.

ARCO alleges that PLC falls within the latter three categories of PRPs—former operator, arranger and transporter—based on its operation of the flood irrigation system and its maintenance of the irrigation ditches on the Property. (*See* ECF No. 179 at 21-22, 29.) PLC contends that ARCO fails to allege sufficient facts to establish that PLC is a PRP, including that there was no "disposal" within the meaning of CERCLA.[8] (ECF No. 182 at 6.) In the alternative, PLC adopts Diamond X's arguments that ARCO's relief

---

[7] Section 9607(a) defines the four classes, in pertinent part, as follows:

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance.

[8] ARCO does not allege that PLC falls within the first class of PRP.

is limited to contribution under Section 113(f)(1). (*Id.* at 7.) Because the Court finds that ARCO has alleged sufficient facts to establish PLC's liability as a former operator, the Court will not address the other two categories of PRPs.

Former operators are "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of[.]" 42 U.S.C. § 9607(a)(2). Finding this definition to be circular and unhelpful, the Supreme Court clarified that "under CERCLA, an *operator* must manage, direct, or conduct *operations specifically related to pollution*, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Bestfoods*, 524 U.S. at 66-67 (emphasis added). The Court found that CERCLA "must be read to contemplate 'operations' as including the exercise of direction over the facility's activities." *Id.* at 71. This clarification followed the Ninth Circuit's earlier definition of an operator as any party with the "authority to control the cause of the contamination at the time the hazardous substances were released into the environment." *Kaiser Aluminum*, 976 F.2d at 1341. The Ninth Circuit's "operator" definition has been held to be consistent with *Bestfoods'* definition. *See City of Los Angeles v. San Pedro Boat Works*, 635 F.3d 440, 451-52 (9th Cir. 2011); *see also City of Moses Lake v. U.S.*, 458 F. Supp. 2d 1198, 1227 (E.D. Wash. 2006); *Nu-W. Min. Inc. v. U.S.*, 768 F. Supp. 2d 1082, 1089 (D. Idaho 2011); *Wells Fargo Bank, N.A. v. Renz*, 795 F. Supp. 2d 898, 915-16 (N.D. Cal. 2011). Moreover, as the *City of Los Angeles* court noted, "operator liability has been construed expansively in this circuit and others." *City of Los Angeles,* 635 F.3d at 444 (internal quotation marks omitted). Accordingly, in determining operator liability, courts evaluate (1) whether the operation is "specifically related to pollution," and (2) whether the operator's activities are considered a "disposal." S*ee City of Moses Lake*, 458 F. Supp. 2d 1198; *Roberts v. Heating Specialist Inc.*, No. 3:12-CV-01820-SI, 2014 WL 3845877, at *11 (D. Or. Aug. 5, 2014); *Steadfast Ins. Co. v. United States*, No. CV 06-4686 AHM (RZx), 2009 WL 3785565, at *3 (C.D. Cal. Nov. 10, 2009).

### 1.   Operation Specifically Related to Pollution

ARCO alleges that PLC's operation was specifically related to pollution because of PLC's operation of the flood irrigation system and maintenance of the irrigation ditches. (ECF No. 179 at 21-22.) In terms of the operation of the irrigation system, ARCO asserts that PLC operated and had the authority to operate the flood irrigation system on the Property allowing Bryant Creek waters to flow and be transported onto the Property by way of irrigation ditches. (ECF No. 179 at 21.) ARCO states that "in operating the irrigation system on the Diamond X Property, [PLC] determined if, when, where and how much water containing hazardous substances was placed and deposited on the Diamond X Property." (*Id.*) ARCO further alleges that PLC "had complete authority to control the placement, deposition, and disposal of water containing hazardous substances on the Diamond X Property, and exercised that authority through operation of the irrigation system." (ECF No. 179 at 21-22.) In terms of maintenance, the gist of ARCO's allegations is that PLC carried out maintenance activities involving "the removal of sediment containing hazardous substances from and around the irrigation ditches and movement to and placement, deposition, and discarding of the sediment and hazardous substances" that "resulted in the moving, spreading, and release or threatened release of hazardous substances" on the Property and surrounding properties. (*Id.* at 22.) According to ARCO, "Diamond X and [PLC] carried out these maintenance activities related to the irrigation ditches on the Diamond X Property and on other properties, with the intent to dispose of the sediment and hazardous substances on the Diamond X Property and on other properties." (*Id.*)

Accepting these allegations as true and construing "operator" "expansively," *City of Los Angeles,* 635 F.3d at 444, ARCO has sufficiently alleged facts to establish operator liability to satisfy *Kaiser Aluminum's* definition of "operator," assuming the flood irrigation system meets the disposal requirement under the statute.

In *Kaiser Aluminum,* the City of Richmond hired Ferry & Son to excavate and grade a portion of property that it had purchased from the defendant's predecessor for a

proposed housing development. 976 F.2d at 1339. Ferry & Son spread some of the displaced soil, which contained hazardous materials, over other parts of the property during its excavation activities. *Id.* at 1339-40. The defendant asserted a third-party complaint for contribution against Ferry & Son, alleging that "Ferry exacerbated the extent of the contamination by extracting the contaminated soil from the excavation site and spreading it over uncontaminated areas of the property." *Id.* at 1340. The court found that these allegations were sufficient to show Ferry & Son had "control over this phase of the development" such that it was an "operator" within the meaning of section 9607(a). *Id.* at 1342.

ARCO asserts similar allegations that PLC "determined if, when, where and how much water containing hazardous substances was placed and deposited" on the Property. (ECF No. 179 at 21.) According to ARCO, by its operations of the flood irrigation system, PLC "had complete authority to control the placement, deposition, and disposal of water containing hazardous substances" on the Property. (*Id.* at 21-22.) ARCO makes similar allegations about PLC's role in carrying out maintenance activities involving the irrigation ditches that resulted in discarding of hazardous substances on the Property. (*Id.* at 22.) Accepting these allegations as true, ARCO has sufficiently alleged that PLC's operations on the Property were "specifically related to pollution."

PLC contends that the activities related to flood irrigation are associated with ranching, not managing or disposing of hazardous substances. (ECF No. 182 at 11.) Specifically, PLC refutes ARCO's allegations that "opening the irrigation system headgates" and "periodic maintenance of the irrigation ditch" are operations related to hazardous waste disposal. (*Id.*) However, the same characterization may be ascribed to the activities in *Kaiser Aluminum*—Ferry & Son were excavating and grading for a proposed housing development, not managing disposal of hazardous substances.

PLC relies on *Redevelopment Agency of City of Stockton v. Burlington Northern and Santa Fe Ry. Corp.,* to argue that it does not qualify as an "operator" under CERCLA. *Redevelopment Agency of City of Stockton v. Burlington N. and Santa Fe*

*Ry. Corp.,* CIV S05-02087 DFLJFM, 2007 WL 1793755 (E.D. Cal. June 19, 2007), *aff'd in part, rev'd in part sub nom. Redevelopment Agency of City of Stockton v. BNSF Ry. Co.,* 643 F.3d 668 (9th Cir. 2011).[9] In *Redevelopment Agency*, the State of California installed an underground perforated pipe, or "french drain," to facilitate drainage near train tracks. *Id.* at *1. Following the drain installation, the defendant railroads took over title to the property as well as operation and maintenance of the french drain. *Id.* Later, the railroads sold their interest to a redevelopment agency, which then discovered contamination at the drain from a nearby petroleum facility. *Id.* Contaminated water had flowed into the drain, polluting the soil around the drain and contaminating the property at the outlet of the drain. *Id.* The district court held that regardless of whether the railroads knew about or generally operated the french drain when the contamination occurred, the railroads were not "operators" under CERCLA. *Id.* at *5. The district court relied on *Bestfoods* in finding that the railroads did not "'manage, direct or conduct activities specifically related to pollution' in connection with the french drain." *Id.* (quoting *Bestfoods*, 524 U.S. at 66-67). The district court found that the "french drain never was intended to serve as a conduit for hazardous materials, nor . . . did the [r]ailroads [operate it] for a purpose related to pollution." *Id.*

PLC asserts that, like the french drain, the flood irrigation ditches were not designed to be conduits for hazardous waste or used for operations "specifically related to pollution." (ECF No. 193 at 5.) However, unlike the railroads, PLC's role in the operation of the irrigation ditches was more active. As alleged, "in operating the irrigation system on the Diamond X Property, [PLC] determined if, when, where and how much water containing hazardous substances was placed and deposited on the Diamond X Property." (ECF No. 179 at 21.) Moreover, ARCO also alleged that PLC's maintenance activities involved "movement to and placement, deposition, and discarding of the sediment and hazardous substances" and were undertaken "with the

---

[9] The district court's decision that the railroads were not liable as "operators" was not an issue on appeal.

1  intent to dispose of the sediment and hazardous substances on the Diamond X Property
2  and on other properties." (ECF No. 179 at 22.)

3        As the *Kaiser Aluminum* court teaches, the court "begin[s] [its] analysis with the
4  proposition that CERCLA 'is to be given a broad interpretation to accomplish its
5  remedial goals." 976 F.2d at 1343 (quoting *Stevens Creek Assoc. v. Barclays Bank of
6  Cal.,* 915 F.2d 1355, 1363 (9th Cir. 1990)). Giving meaning to this "broad interpretation"
7  and accepting ARCO's allegations as true, PLC's alleged management, operations and
8  control of the flood irrigation system and irrigation ditches on the Property were
9  "specifically related to pollution."

10              **2.    Disposal**

11       PLC asserts that whether flood irrigation amounts to a "disposal" under CERCLA
12  is a matter of first impression and relies on the statute, case law, and exemptions to
13  liability under CERCLA to argue that flood irrigation is not a "disposal." ARCO counters
14  that CERCLA defines "disposal" broadly to cover the activities alleged in its third-party
15  complaint.

16       CERCLA borrows the definition of "disposal" from the Solid Waste Disposal Act.
17  42 U.S.C. § 9601(29). "[D]isposal means the discharge, deposit, injection, dumping,
18  spilling, leaking or placing of any solid waste or hazardous waste into or on any land or
19  water so that such solid waste or hazardous waste or any constituent thereof may enter
20  the environment. . ." 42 U.S.C. § 6903(3). "CERCLA's definition of 'disposal' expressly
21  encompasses the 'placing of any . . . hazardous waste . . . on any land.'" *Kaiser*
22  *Aluminum,* 976 F.2d at 1342 (quoting 42 U.S.C. § 6903(3)). This includes subsequent
23  movement, dispersal, or release of hazardous substances during excavations. *Id.*
24  (citations and quotation marks omitted). Generally, human activity that moves
25  contaminates constitutes "disposal" under § 107(a)(2). *See Carson Harbor Village, Ltd.*
26  *v. Unocal Corp.*, 270 F.3d 863, 876 (9th Cir. 2001) (*en banc*); *Kaiser Aluminum*, 976
27  F.2d at 1342. But passive activities may also be considered to be disposal. *See Carson*
28  *Harbor*, 270 F.3d at 876-77 (discussing that some courts permit "passive" activities to

17

constitute a "disposal" under CERCLA although it found "passive soil migration" to not fit within CERCLA's definition of "disposal"); *compare Pakootas v. Teck Cominco Metals, Ltd.* No. 15-35228, 2016 WL 4011196, at *6-8 (9th Cir. July 27, 2016) (finding that deposition of airborne hazardous waste was not a "disposal" under CERCLA). In fact, the Ninth Circuit rejected the "absolute binary" of the "active/passive distinction" and clarifies that courts "must examine each of the terms in relation to the facts of the case and determine whether the movement of contaminants is, under the plain meaning of the terms, a "disposal." *Carson Harbor,* 270 F.3d at 879 (internal quotation marks omitted).

As alleged, PLC placed and deposited water containing hazardous substances on the Property, removed sediment containing hazardous materials from the ditches, and placed and discarded these materials on the Property, all of which resulted in the release or threatened release of hazardous substances. (ECF No. 179 at 21-22.) PLC's operation of the flood irrigation system on the Property and maintenance of the irrigation ditches as alleged fall within CERCLA's definition of "disposal": "placing of any . . . hazardous waste . . . on any land or water . . ." 42 U.S.C. § 6903(3); *see Kaiser Aluminum*, 976 F.2d at 1342. The activities are similar to the activities found to amount to "disposal" in *Kaiser Aluminum*—moving displaced contaminated soil to portions of the property that did not contain tainted soil. *Id.* The express language of the statute compels a finding that ARCO has sufficiently alleged activities that meet the statutory definition of "disposal."

The cases that PLC relies upon support this finding. For example, PLC analogizes this case to *Carson Harbor* for the proposition that flood irrigation is akin to passive migration and not "disposal." (ECF No. 182 at 15). However, *Carson Harbor* involved passive migration of hazardous substances through the soil. *Carson Harbor,* 270 F.3d at 879. The court found that disposal is not limited to releases caused by human conduct and may cover passive migration (although not passive soil migration) occurring while the former owner possessed the property. *Id.* at 879-81. Here, ARCO

alleges that PLC knowingly diverted contaminated water from Bryant Creek and deposited the water through a man-made irrigation system onto the Property. (ECF No. 179 at 21.) They also allege that PLC maintained the flood irrigation system by removing contaminated sediment from the ditches and disposing the sediment elsewhere on the Property. (*Id.*) Accepting these allegations as true, PLC's use of contaminated water to irrigate the Property, and removing sediment containing hazardous substances and placing them on the Property, are not akin to the passive soil migration presented in *Carson Harbor*. Passive migration here would be akin to PLC allowing contaminated creek water to migrate onto the Property along Bryant Creek without taking any action. However, here, PLC actively using polluted creek water for flood irrigation and disturbed contaminated sediment as alleged in the third-party complaint. Accordingly, PLC's flood irrigation activities and maintenance of the irrigation ditches cannot be considered passive migration of contaminants.

PLC also relies on *Coppola v. Smith* (*Coppola I*), 935 F. Supp. 2d 993 (E.D. Cal. 2013), to assert that disposal requires an "affirmative act of discarding" hazardous waste. (ECF No. 182 13-14.) In *Coppola I*, the plaintiff argued that the defendant water company should be a PRP because its past ownership and operation of an abandoned well exacerbated a contamination plume. *Coppola I*, 935 F. Supp. 2d at 1021-22. The court held that the plaintiff's allegations were insufficient to constitute disposal because the complaint did not allege an "affirmative act of discarding," but the court granted leave for the plaintiff to amend. *Id.* at 1023-24. In *Coppola v. Smith* (*Coppola II*), 19 F. Supp. 3d 960 (E.D. Cal. 2014), the court found that the allegations that the water company's operation caused contaminants to be "deposited" or "leaked" into deeper groundwater zones were sufficient to allege that a "disposal" had occurred at the well. *Id.* at 973. Similarly here, ARCO alleges that PLC "deposited" contaminants on the Property.

PLC cites to *3550 Stevens Creek Associates v. Barclays Bank of Cal.*, 915 F.2d 1355 (9th Cir. 1990), to argue that "disposal" must involve allegations of "an affirmative

act of discarding a substance as waste" and that "the act of irrigating a pasture is not discarding." (ECF No. 182 at 13.)  PLC's argument is unpersuasive. First, as discussed, "disposal" as defined under CERCLA covers "discharge, deposit, injection, dumping, spilling, leaking or placing." 42 U.S.C. § 9607(a). Moreover, PLC's analogy misconstrues the holding in *3350 Stevens Creek*. That case involved recovery of response costs for clean-up of asbestos installed in a commercial building. 915 F.2d at 1356. The court found that CERCLA's definition of "'disposal' pertains to 'solid waste or hazardous waste,' not to building materials [such as asbestos materials installed in building structure] which are neither." *Id.* at 1361.

PLC relies on CERCLA's exclusion of certain activities with recognized beneficial use to argue that flood irrigation, like these exempt activities, was conducted for legitimate reasons. (ECF No. 182 at 14-15.) This argument is similarly tenuous. Exempt activities, such as the application of fertilizer, or irrigation return flow, either require or involve the use of materials containing hazardous substance. Irrigation in and of itself does not require or involve the use of water containing hazardous substances.

Finally, PLC argues that irrigation using water rights from Bryant Creek is permitted under the Alpine Decree and therefore cannot amount to "an affirmative act of discarding." (ECF No. 182 at 13.) Applying this logic would contravene the "broad interpretation" to be given to CERCLA in general and the expansive interpretation to be given to the definition of "disposal" in particular. Indeed, there are legitimate activities that have been found to amount to "disposal." For example, the excavation of soil in *Kaiser Aluminum* was also an activity otherwise permitted. The Ninth Circuit found that the excavation of contaminated soil, moving it away from the excavation site and spreading it over untainted portions of the property for purposes of housing development amounted to "disposal" under CERCLA.  *Kaiser Aluminum*, 976 F.2d at 1342.  Indeed, ARCO does not merely allege that PLC utilized Alpine Decree rights, but that PLC "determined if, when, where and how much water containing hazardous substances was placed and deposited on the Diamond X Property."  (ECF No. 179 at

21.)

"'Disposal'" has been interpreted broadly to include activities beyond the introduction of hazardous waste onto property. *Kaiser Aluminum*, 976 F.2d at 1342. Applying this broad interpretation here, the Court finds that ARCO has alleged sufficient facts to satisfy CERCLA's definition of "disposal."

## VI.   CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion or reconsideration as they do not affect the outcome of the Motions to Dismiss.

It is therefore ordered that Diamond X's motion to dismiss (ECF No. 144) is denied.

It is further ordered that Park Livestock's motion to dismiss (ECF No. 182) is denied.

DATED THIS 26th day of August 2016.

_____
MIRANDA M. DU
UNITED STATES DISTRICT JUDGE