UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| DIAMOND X RANCH LLC, | Case No. 3:13-cv-00570-MMD-WGC |
| Plaintiff/Counterclaim Defendant, | ORDER |
| v. | |
| ATLANTIC RICHFIELD COMPANY, | |
| Defendant/Counterclaimant/ Third-Party Plaintiff, | |
| v. | |
| PARK LIVESTOCK CO., | |
| Third-Party Defendant. | |

## I.    SUMMARY

This case concerns cleanup of acid mine drainage ("AMD") from a Superfund site and its surrounding areas. Pending before the Court are five motions: (1) Defendant Atlantic Richfield's ("ARCO") Motion for Summary Judgment on Diamond X Ranch LLC's ("Diamond X") Tort Claims as Barred by the Statute of Limitations ("SOL Motion") (ECF No. 228); (2) ARCO's Motion for Summary Judgment on Diamond X's Seventh and Eighth Claims under CERCLA ("CERCLA I Motion") (ECF No. 229); (3) ARCO's Motion for Summary Judgment to Limit or Dismiss Diamond X's Tort Claims ("Tort Motion") (ECF No. 230); (4) Diamond X's Motion for Partial Summary Judgment Concerning ARCO's Liability as to CERCLA and Certain Common Law Claims ("Liability Motion") (ECF No. 231); and (5) ARCO's Motion for Partial Summary Judgment on ARCO's CERCLA Claims

against Diamond X and Park Livestock, Co. ("CERCLA II Motion") (ECF No. 248). The Court has reviewed Diamond X's responses (ECF Nos. 260, 261, 262) and reply (ECF No. 285), ARCO's response (ECF No. 258) and replies (ECF Nos. 282, 283, 284), as well as the accompanying exhibits. The Court also heard oral arguments on these pending motions on August 30, 2017. (ECF No. 296.)

For the reasons discussed below, the SOL Motion is granted in part and denied in part; the Tort Motion is granted in part and denied in part; the Liability Motion is denied; the CERCLA I Motion is granted in part and denied in part; and the CERCLA II Motion is granted.

## II. BACKGROUND

Diamond X initiated this action on October 15, 2013, against ARCO. (ECF No. 1.) It filed its Third-Amended Complaint ("TAC") on March 18, 2016. (ECF No. 175.) ARCO then filed its Counterclaim against Diamond X and Third-Party Complaint against Park Livestock Co. ("Park Livestock") on March 30, 2016. (ECF No. 179.) The following facts are undisputed except as noted.

Diamond X currently owns the River Ranch property ("Property" or "River Ranch"), which is comprised of more than 1700 acres in Douglas County, Nevada, and Alpine County, California. (ECF No. 231-1 at 11; ECF No. 175 at ¶ 7.) Park Livestock has leased the River Ranch since its incorporation in 1974 until at least 2007. (ECF No. 260 at 8.) The Property has been owned by the Park family for the last 100 years. (*See* ECF No. 175 at ¶ 26; ECF No. 227-39 at 15 ("Through an interview with Mr. David Park . . . we found that the Park family has owned the property since the 1890s.").) In 1974, the Property was owned by W. Brooks Park and Jeanne Park. (ECF No. 260 at 8.) The Property was then transferred to the W. Brooks Park Family Trust in 1985. (*Id.* at 9.) Diamond X obtained the Property via trust distribution in 2003. (*Id.*) Diamond X's two principals are David Park and W. Bruce Park and David Park is the current president and majority shareholder of Park Livestock. (ECF No. 225 at ¶ 5.)

///

In 1951, ARCO's predecessor, The Anaconda Company ("Anaconda"), acquired the Leviathan Mine ("Mine") where it conducted open-pit sulfur mining from approximately 1953 to 1962. (ECF No. 248 at 7; ECF No. 175 at ¶ 7.) Water that came in contact with waste rock at the Mine created AMD, which contains elevated concentrations of heavy metals such as arsenic. (ECF No. 248 at 7.)

In 1997, the U.S. Environmental Protection Agency ("EPA") began to take action at the Mine under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). (ECF No. 248 at 7; ECF No. 175 at ¶ 15.) EPA listed the Mine on the National Priorities List in May 2000, and it identified ARCO and the State of California as potentially responsible parties ("PRPs"). (ECF No. 175 at ¶ 17.) EPA issued a Unilateral Administrative Order ("UAO") against ARCO in November 2000 and a second UAO against ARCO in June 2008 (collectively "UAOs"). (ECF No. 246-3 at 90-139 (Exhibit 148); ECF No. 227-1.)

The UAOs identified ARCO as a PRP[1] and required ARCO to initiate a Remedial Investigation and Feasibility Study ("RI/FS") of contamination from the Mine and to prepare and perform an RI/FS based on a Statement of Work ("SOW"). The purposes of the UAOs were (1) to determine the nature and scope of contamination from the Mine and its threat to public health and the environment, and (2) to determine and evaluate alternatives to effectively remediate the contamination through a feasibility study. (ECF No. 249-5 at 6; ECF No. 246-3 at 92; ECF No. 227-3 at 16.) Under the SOW, ARCO was required to conduct a "phased" evaluation to determine the available remedial approaches and to then compile this information into a report. (ECF No. 227-1 at 47.) The River Ranch became included in the study area of ARCO's remedial investigation in 2012. (ECF No. 227-3 at 19 (including portions of the River Ranch in the supplemental study

---

[1]On January 21, 2009, EPA and ARCO entered into an Administrative Settlement Agreement and Order on Consent for Removal Action, wherein ARCO admitted that the Mine is a "facility" under CERCLA, the contamination found at the Mine includes "hazardous substances," ARCO is the successor to the liabilities of Anaconda, and the discharge of AMD from the Mine constitutes an actual or threatened release of hazardous substances. (ECF No. 246-3 at 1-51 (Exhibit 136).)

area); ECF No. 227-7 at 15 (including irrigated portions of the River Ranch in the supplemental study area).)

### III.    LEGAL STANDARD

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (internal citation omitted). Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits show "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party and a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. *See id.* at 250-51. "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)). In evaluating a summary judgment motion, a court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

The moving party bears the burden of showing that there are no genuine issues of material fact. *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd v. Fritz Cos., Inc.,* 210 F.3d 1099, 1102 (9th Cir. 2000) (internal citation omitted). Once the moving

4

party satisfies Rule 56's requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 783 (9th Cir. 2002) (internal citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252.

A party is also permitted to seek partial summary judgment as to any claim or defense in a case. Fed. R. Civ. P. 56(a); *see also First Nat'l Ins. Co. v. Fed. Deposit Ins. Corp.*, 977 F. Supp. 1051, 1055 (S.D. Cal. 1997) (a court may grant summary adjudication as to specific issues if it will narrow the issues for trial). A district court may award a partial summary judgment that decides only the issue of liability. *White v. Lee*, 227 F.3d 1214, 1240 (9th Cir. 2000).

Further, "when parties submit cross-motions for summary judgment, '[e]ach motion must be considered on its own merits.'" *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (quoting William W. Schwarzer, et al., *The Analysis and Decision of Summary Judgment Motions*, 139 F.R.D. 441, 499 (Feb. 1992) (citations omitted)). "In fulfilling its duty to review each cross-motion separately, the court must review the evidence submitted in support of each cross-motion." *Id.*

## IV. CHOICE OF LAW

As a preliminary matter, the parties dispute whether California or Nevada law controls Diamond X's tort claims. (*See* ECF No. 231-1 at 24-25; *see also* ECF No. 258 at 20-24.) The Court finds that Nevada law applies to these claims.

A federal district court applies the choice-of-law rules of the forum state when exercising jurisdiction over state law claims. *Love v. Associated Newspapers, Ltd.*, 611 F.3d 601, 610 (9th Cir. 2010); *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151,

1164 (9th Cir. 1996). In Nevada, the Second Restatement's most significant relationship standard generally governs choice-of-law issues in tort actions. *Gen. Motors Corp. v. Eighth Judicial Dist. Court of State of Nev. ex rel. Cty. of Clark*, 134 P.3d 111, 116 (Nev. 2006). Pursuant to the Second Restatement, the place where the injury occurred determines the law to be applied, unless some other state has a more significant relationship to the "occurrence and the parties." *Id.* (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 (AM. LAW INST. 1971); *see also* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 147 (AM. LAW INST. 1971) ("In an action for an injury to land . . . the local law of the state where the injury occurred determines the rights and liabilities of parties unless, with respect to the particular issue, some other state has a more significant relationship[.]").

When determining what state has the most significant relationship, the court must look to such things as: the needs of the interstate system; the relevant policies of the forum; the relevant policies of other interested states and the relative interest of those states in the determination of the particular issue; the protection of justified expectations; the basic policies underlying the particular field of law; certainty, predictability, and uniformity of result; and ease in the determination and application of the law to be applied. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6 (AM. LAW INST. 1971)

Diamond X contends that California law applies to its tort claims because "the majority of contaminated River Ranch land is in California." (ECF No. 231-1 at 25.) However, the primary basis for Diamond X's claims is that a portion of the River Ranch has been contaminated by water diverted from Bryant Creek such that the Property cannot be developed into a residential subdivision.[2] (ECF No. 175 at ¶¶ 28-29.) This

---

[2]In the TAC, Diamond X also states that it is precluded from continued ranching on the Property because "any livestock pastured on the River Ranch Property will drink the contaminated irrigation water and graze on metal-poisoned vegetation growth in metal-laden soil." (ECF No. 175 at ¶ 28.) However, Diamond X states that it brought suit "protectively" once it realized that its proposed alternative use—building a residential community—was also precluded absent extensive remediation costs. (*See* ECF No. 261 at 30; *see also* ECF No. 175 at ¶¶ 29-30.)

subdivision was to be located entirely in Nevada. (*See* ECF No. 255-9 at 6.) In addition, Bryant Creek runs through the portion of the Property that is located in Nevada, and the main diversion point from Bryant Creek for irrigation purposes is also located in Nevada. (*See, e.g.*, ECF No. 254-3 at 17, 41.) Although some of the contaminated land is in California, the land was contaminated by using water diverted from the Bryant Creek irrigation ditch in Nevada.[3] (*See* ECF No. 242 at 342-346.) Other evidence also highlights that Nevada is the state with the most significant relationship to this case. For instance, Diamond X sought the involvement of the Nevada Division of Environmental Protection ("NDEP") as opposed to soliciting a similar California state agency. (*See* ECF No. 264 at ¶ 8; *see also* ECF No. 227-9 at 8.) As such, the state of Nevada has the strongest interest in the resolution of this case.

For these reasons, the Court finds that Nevada law controls Diamond X's state law tort claims.

**V.    SOL Motion (ECF No. 228)**

ARCO contends that Diamond X's first through sixth claims for relief are barred by the statute of limitations. (ECF No. 228 at 18-23.) The Court agrees with ARCO that the statute of limitations applies to Diamond X's claims but finds that there is a genuine issue of material fact as to whether the continuing tort doctrine applies to its claims for trespass, private nuisance, negligence, and wrongful appropriation of water rights.[4]

**A.    Legal Standard**

Under CERCLA, if a state statute of limitations provides a commencement date for claims resulting from a release of contaminants that is earlier than the federal

---

[3]Historically, water was also diverted via Cottonwood Creek to carry water to River Ranch parcel 7, which is located in California. (ECF No. 254-3 at 19.) However, the samples that Diamond X's expert Dr. Dagdigian took from the portion of the Property located in California were irrigated with water from Bryant Creek (as these samples appear to be taken from parcel 8). (*See* ECF No. 242 at 340, 343.)

[4]The Court disposes of the public nuisance claim because there is no such private right of action under Nevada law. *See* discussion *infra* Sec. VI(B). The Court also grants summary judgment in favor of ARCO as to Diamond X's strict liability claim. *See* discussion *infra* Sec. V(D).

commencement date, then plaintiffs benefit from the more generous commencement date. *See O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1146 (9th Cir. 2002). The federal commencement date, 42 U.S.C. § 9658, therefore preempts a state statute of limitations if the state's limitations period begins at an earlier date. *O'Connor*, 311 F.3d at 1146.

In Nevada, a cause of action "accrues when the wrong occurs and a party sustains injuries for which relief could be sought." *Petersen v. Bruen*, 792 P.2d 18, 20 (Nev. 1990). However, Nevada also employs the "discovery rule" whereby "the statutory period of limitations is tolled until the injured party discovers or reasonably should have discovered facts supporting a cause of act." *Id.* Normally when a plaintiff has or should have discovered the cause of her injury is a question of fact, but when "uncontroverted evidence proves that the plaintiff discovered or should have discovered the facts giving rise to the claim" then a determination may be made as a matter of law. *Siragusa v. Brown*, 971 P.2d 801, 812 (Nev. 1998).

A party is barred from asserting a discovery rule tolling defense where she fails to exercise reasonable diligence in attempting to discover the cause of her injury. *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 780 (9th Cir. 2002). In other words, an individual is put on inquiry notice when she should have known of facts that "would lead an ordinarily prudent person to investigate the matter further." *Winn v. Sunrise Hosp. & Med. Ctr.*, 277 P.3d 458, 462 (Nev. 2012) (internal quotation marks and citation omitted). Similarly, under the federal discovery rule, a plaintiff reasonably should have known of her claim when a reasonable person in her situation would have been expected to inquire about the cause of her injury and an inquiry would have disclosed the nature and cause of her injury so as to put her on notice of her claim. *O'Connor*, 311 F.3d at 1150.

While the Nevada and federal discovery rules are similar, the Court finds that the federal rule is more generous because it requires both that the plaintiff be aware of her injury and that an inquiry into the cause of the injury would give her notice of her claim.
///

1  Therefore, the Court utilizes the federal standard in determining whether Nevada's

2  statutes of limitation for the various tort claims bar Diamond X's claims.

3        **B.    Accrual Date**

4        ARCO contends that Diamond X knew the facts underlying its claim long before

5  October 2009.[5] (ECF No. 228 at 9.) The Court agrees and finds that, viewing the evidence

6  in the light most favorable to Diamond X, the latest date that Diamond X was aware of the

7  facts underlying its claim was when W. B. Park Land Company LLC's[6] attorney sent a

8  letter to the state of California, EPA, and a variety of other entities.[7] In this letter, dated

9  March 19, 2007, the attorney informed the various entities that:

10        W.B. Park Land Company, LLC will no longer be grazing cattle on its
          property downstream from the Leviathan Mine, based upon an assessment
11        of the damages *caused by* the Leviathan Mine. In addition, for the present
          time, it will no longer be irrigating the property. These decisions have been
12        made because of the damage caused by the trespass by and the
          contamination from the Leviathan mine.
13

14  (ECF No. 227-42 (emphasis added).) The letter shows that Diamond X believed that the

15  contamination from the Mine caused it damage such that it would cease irrigation and

16  cattle grazing activities. At a minimum, based on the information in the letter, Diamond X

17  was aware of its injury, would have been expected to inquire about the cause of its injury,

18  and an inquiry would have disclosed the nature and cause of Diamond X's injury so as to

19  put Diamond X on notice of its claim. This is because Diamond X had more evidence than

20  just the information upon which the letter was based.

21  _____

22        [5]ARCO relies on this date because the lawsuit was filed in October 2013 and the
     various torts have limitations periods ranging from two to four years. (ECF No. 229 at 9;
     ECF No. 283 at 7.)

23        [6]Diamond X was formed as W.B. Park Land Company, LLC in April 2003 and its
24   name was changed to Diamond X Ranch LLC in January 2010. (*See* ECF No. 227-16 at
     7; *see also* ECF No. 227-10.)

25        [7]Diamond X argues that because ARCO raised the statute of limitations as an
     affirmative defense, ARCO bears the burden of proving that Diamond X's injuries and
26   damages occurred outside the statute of limitations period. (ECF No. 261 at 22 (citing
     *California Sansome Co. v. U.S. Gypsum*, 55 F.3d 1402, 1408 (9th Cir. 1995).) At the
27   hearing on August 30, ARCO presented evidence of dates from which the Court could
     reasonably find Diamond X's claims to have accrued by. Therefore, the Court finds that
28   ARCO has met its burden to show that the accrual date occurred outside of the limitations
     period.

In fact, there is ample evidence available up to that point that Diamond X knew that Bryant Creek and some of the Property was contaminated to some degree by AMD from the Mine. For instance, in 2005 Diamond X hired an environmental consultant, Robison Engineering Company ("Robison"), to conduct a Phase I Environmental Site Assessment of the River Ranch. (ECF No. 227-39.) In its report, Robison states that "Bryant Creek, which crosses portions of the River Ranch, has been contaminated with heavy metals that originated from [AMD] from the Leviathan Mine" and that the water from Bryant Creek was "ultimately used to irrigate the fields around and southwest of the ranch house." (*Id.* at 5, 15.) While this report ultimately found that "very little is known about the impacts that this irrigation has had on the site soils" (*id.* at 21), the report repeatedly stated that Bryant Creek was contaminated, therefore putting Diamond X on notice, at a minimum, of its claim for wrongful appropriation of water rights.

Then, after conducting another study in 2006, Robison sent David Park a letter report indicating that soils on portions of the Property "have significantly elevated concentrations of heavy metals as a result of irrigation with the Bryant Creek water, when compared against baseline samples from an earlier study conducted in the area" and that there were elevated concentrations of arsenic, iron, and thallium that exceed EPA's preliminary remediation goals for residential soil. (ECF No. 227-40 at 2, 8.) At the very least, this put Diamond X on notice that there was some degree of contamination on the Property as a result of AMD pollution to Bryant Creek. Moreover, in February of 2004, W.B. Park Land Company LLC's attorney sent ARCO a demand letter threatening to sue ARCO for contamination to the Property—contamination that affected its use of the Property—and for loss of use of its water rights.[8] (ECF No. 254-4.) This further demonstrates that prior to October 2009 Diamond X was on notice of contamination of its

///

---

[8]David Park admitted in a deposition taken on August 5, 2015, that the 2005 Robison report notified them that Bryant Creek was contaminated with heavy metals resulting from AMD emitted from the Mine but contested the extent of the contamination. (*See* ECF No. 254-2 at 16.)

Property and that the likely cause of that contamination and loss of use of water rights was AMD from the Mine.

In response, Diamond X states two reasons why ARCO cannot prevail on its statute of limitations argument: "(1) the evidence demonstrates agreement amongst all of the persons investigating River Ranch there was an insufficient basis, prior to 2012, to determine the Mine had caused elevated concentrations of arsenic on the River Ranch; and (2) the evidence demonstrates it remained an open question prior to 2012, despite a multi-year investigation, whether the River Ranch had suffered actual injury or damage that would restrict use of the property." (ECF No. 261 at 25.) However, certainty of cause or of the extent of injury is not required to trigger the commencement date. *See Siragusa* 971 P.2d at 807 ("The statute [of limitations] should not commence to run until the plaintiff with due diligence knows to a *reasonable probability* of injury, its nature, its cause, and the identity of the allegedly responsible defendant.") (internal quotation marks and citation omitted) (emphasis added)); *see also Wallace v. Kato*, 549 U.S. 384, 391 (2007) ("The cause of action accrues even though the full extent of the injury is not then known or predictable.") (internal quotation marks and citation omitted).

Moreover, even if Diamond X did not know until 2012 that it could not develop the Property into a residential development, it was aware of some injury to its land and water rights caused by contamination from the Mine that affected some use of the Property, thereby triggering inquiry notice. Diamond X relies on the Ninth Circuit's decision in *O'Connor* to argue that because it did not know the nature of its injury—specifically that it had lost "an unrestricted ability to develop the Property"—and because environmental consultants "were unable or unwilling to draw a conclusion about whether the arsenic contamination at River Ranch could have resulted from causes other than the releases from the Mine" there are triable issues of fact. (ECF No. 261 at 27.) However, this case is dissimilar from *O'Connor* in two important respects.

First, in *O'Connor*, there was a factual dispute as to whether the plaintiffs should have inquired about the contamination from the testing facilities as the cause of their

cancers. 311 F.3d at 1151. The plaintiffs' doctors had never advised them that their conditions may have been related to pollution from the testing facilities and publicly available information pointed to a variety of products as potential causes of cancer. *Id.* Thus, it was up for debate as to whether to impute knowledge to plaintiffs based on publicity about pollution at the testing facility. By contrast, here, Diamond X did inquire into contamination on the Property by employing various consultants beginning in 2005. (*See*, *e.g.*, ECF No. 227-39.) In addition, the 2007 letter indicates that Diamond X strongly believed, based on its inquiry, that the Mine was the cause of contamination of the Property, so much so that it ceased irrigating the Property with water from Bryant Creek, which it knew to be contaminated with AMD from the Mine. Thus, based on this undisputed evidence, the Court is able to impute knowledge to Diamond X as to the cause of its injury.

Second, in *O'Connor*, there was a factual dispute as to whether and when the plaintiffs had the "means to test the potential causes of their diseases in a way that would disclose the nature and cause of their injuries so as to put them on notice of their claims." 311 F.3d at 1156 (internal quotation marks omitted). By contrast, from the Robison reports Diamond X was on notice in 2005 that Bryant Creek water was contaminated by AMD from the Mine and in 2006 that a portion of the soil on the Property contained elevated levels of arsenic that were above residential levels. Diamond X argues that there is a fact issue as to whether it could have developed the facts underlying its claim sooner given "ARCO's sophistication and longstanding duty to EPA to develop such facts." (ECF No. 261 at 28.) However, there is no dispute that Diamond X had the means to inquire into whether contamination affected the use of the Property and whether AMD from the Mine was the cause of the contamination because it actually did so, as evidenced in the 2005 and 2006 Robison reports and the 2007 letter from its attorney.[9]

---

[9]Diamond X claims that it was not in the position to develop the facts sooner, but according to the 2005 Robison report, EPA had requested access to the Property to test soil samples, which the Park family denied. (ECF No. 227-39 at 19.)

## C.   Applicability of Continuing Tort Doctrine

Where a plaintiff can show that its claim is a continuing violation, the statute of limitations serves only to limit damages to those incurred within the limitations period before the suit was filed. *See Skokomish Indian Tribe v. United States*, 410 F.3d 506, 518 (9th Cir. 2005). "To show a continuing violation, the plaintiff must demonstrate that the damage is reasonably abatable, which means that the condition can be removed without unreasonable hardship and expense." *Id.* (internal quotation marks, alterations, and citation removed). Alternatively,[10] a continuing violation may be established where "contaminants continue to migrate through land and groundwater causing new and additional damage on a continuous basis." *Beck Dev. Co. v. S. Pac. Transp. Co.*, 52 Cal. Rptr. 2d 518, 557 (Cal. Ct. App. 1996).

The Court finds that there is a genuine issue of material fact as to whether AMD continues to contaminate the River Ranch—by way of migration or otherwise—and whether abatement of the contamination on the Property is reasonable.

ARCO argues that there is no evidence that contaminants continue to migrate through land and groundwater on the Property causing new and additional damage to the Property on a continuous basis. (ECF No. 228 at 27.) The Court disagrees. Although Diamond X stopped irrigating the River Ranch with Bryant Creek water, Diamond X points to evidence in the record indicating that AMD from the Mine continues to release into and within the Bryant Creek watershed, contaminating the Property that is located on Bryant Creek. (ECF No. 261 at 38.) Moreover, Diamond X's expert testified that the contaminants will spread through the action of wind and rainwater on the Property (ECF No. 254-3 at 13), which potentially could spread the contamination from the soil to other parts of the Property or to plant tissues on the Property. Because continuing activity by Defendant— i.e., use of the Mine—is not necessary to establish certain types of continuing violations,

---

[10]The Court agrees with Diamond X that it need not prove that all three possible tests for determining a continuing violation be established to invoke the doctrine. (*See* ECF No. 261 at 36.)

see *Mangini v. Aerojet-Gen. Corp.* (*Mangini I*), 230 Cal. App. 3d 1125, 1147 (Cal. Ct. App. 1991) ("[t]he 'continuing' nature of the nuisance refers to the continuing damage caused by the offensive condition, not to the acts causing the offensive condition to occur"), at a minimum Diamond X has demonstrated that there is a genuine issue of material fact as to whether the contaminants continue to migrate through the Property causing new and additional damages.

ARCO also argues that the contamination is not reasonably abatable. (ECF No. 228 at 27-28; ECF No. 283 at 16.) Whether the contamination is reasonably abatable turns on whether it can be remedied at a reasonable cost by reasonable means. *Mangini v. Aerojet-Gen. Corp.* (*Mangini II*), 912 P.2d 1220, 1229 (Cal. 1996). In determining whether something is reasonably abatable, courts may look to such considerations as expense, time, and legitimate competing interests. *Beck*, 52 Cal. Rptr. 2d at 558-59. Diamond X points out that there are several purported methods and estimations regarding the cost of abatement. (ECF No. 261 at 36-37.) For instance, one of ARCO's experts estimated that the cost of abatement would be roughly $5 million for soil remediation while Diamond X's experts estimated the cost to be between $16 and $24 million for soil remediation and roughly $2.7 million for water cleanup, and these experts contest the appropriate mechanism to remediate the arsenic-contaminated soils.[11] (*See* ECF No. 263-1 at 214-218; ECF No. 242 at 155-157; ECF No. 227-43 at 15.) Therefore, Diamond X has shown that there is a genuine issue of material fact as to whether abatement of the contamination is reasonable.

ARCO also argues that Diamond X's proposed abatement is barred by CERCLA §§ 113(h) and 122(e)(6)'s preclusion of private cleanup work at a site after an RI/FS has

---

[11]Moreover, there is a dispute about the value of the Property (*see* ECF No. 258 at 11), which is a relevant consideration in light of the Ninth Circuit's ruling in *Skokomish Indian Tribe*. *See Skokomish Indian Tribe*, 410 F.3d at 518 ("finding that because the property was valued at $2,170,040 before the damage and that the total remediation cost was $3,770,500, the large discrepancy between the value of the property and the cost of repair showed abatement could only be achieved with unreasonable hardship and expense").

14

been initiated unless it is based upon prior approval by EPA. (ECF No. 228 at 27-31.) However, there is no contention that receiving monetary damages from ARCO for the contamination of the Property requires that Diamond X cleanup[12] the Property or amount to a challenge to the cleanup methods selected by EPA in cleaning up the River Ranch if it instructs ARCO to do so. Challenges to CERCLA cleanups generally include such actions "where the plaintiff seeks to dictate specific remedial actions; to postpone the cleanup; to impose additional reporting requirements on the cleanup; or to terminate the RI/FS and alter the method and order of cleanup." *ARCO Envtl. Remediation, L.L.C. v. Dep't of Health & Envtl. Quality of Mont.*, 213 F.3d 1108, 1115 (9th Cir. 2000) (internal citations omitted). Recovering damages for particular continuing torts does not amount to any of the aforementioned actions.

Therefore, the Court finds that there is a genuine issue of material fact as to whether the continuing tort doctrine applies to Diamond X's claims.

### D. Claims Benefitting from the Continuing Tort Doctrine

ARCO argues that as a matter of law the continuing tort doctrine applies only to trespass and nuisance claims and, therefore, the claims for negligence, strict liability, and misappropriation of water rights may not proceed if the Court finds that the statute of limitations applies. (ECF No. 228 at 23-24.) Diamond X counters that because ARCO's offending acts and omissions are ongoing, Diamond X may benefit from the doctrine as to all of its tort claims. (ECF No. 261 at 43.)

The Court finds that the continuing tort doctrine does not apply to the claim for strict liability. Diamond X cites to *Christian v. Atl. Richfield Co.*, 358 P.3d 131, 150 (Mont.

---

[12]ARCO relied on an amicus brief that the Department of Justice ("DOJ") attempted to submit in a Montana state case. (ECF Nos. 278, 278-2.) In that case, the plaintiffs had filed claims for negligence, nuisance, trespass, and strict liability (as well as others) and sought recovery of restoration damages. (ECF No. 278-2 at 20.) DOJ argued that because a grant of restoration damages in Montana requires that the damage award actually be used to abate the injury to one's property, this is inconsistent with the CERCLA remedy already approved by EPA and is therefore not authorized under §§ 113(h) and 122(e)(6). (*Id.* at 21, 25, 36.) The Court is not persuaded. There is no claim by ARCO that Nevada requires that damages for a continuing trespass or nuisance, *see* discussion *infra* Sec. 5(D), be used towards abatement of the injury.

2015), in support of application of the continuing tort doctrine to a strict liability claim. (ECF No. 261 at 43.) That case applies Montana law and is unpersuasive here. Moreover, applying the doctrine to Diamond X's strict liability claim would erode the purpose of the statute of limitations because strict liability does not require a showing of intent or fault and, therefore, the tort would inherently be continuing in nature.

The Court finds that the doctrine may apply to Diamond X's claims for negligence[13] and for misappropriation of water rights in addition to its claims for trespass and nuisance because there is a genuine issue of material fact as to whether AMD released during the limitations period into Leviathan Creek contaminated Bryant Creek and Diamond X's parcels of land that abut the Creek. Therefore, to the extent any AMD released from the Mine infected Bryant Creek during the limitations period, this may have impacted Diamond X's water rights or caused injury to Diamond X's parcels that abut the Creek, but a genuine issue of material fact remains as to whether ARCO's own acts or omissions resulted in these releases or caused a bona fide injury. (*See* ECF No. 179 at ¶ 22 ("any such discharges are [not] adversely affecting water quality in Bryant Creek at the point at which Diamond X previously diverted water on its property for irrigation"): *see* ECF No. 261 at 38 ("there is also evidence of continued releases into and within the Bryant Creek watershed for which Diamond X had water rights"); *see also* ECF No. 258 at 13 ("The amount of AMD from the Leviathan Mine that is not currently collected and treated is less than one percent of the total volume of water in the Leviathan, Bryant Creek watershed").)

Therefore, summary judgment is granted in favor of ARCO as to Diamond X's fourth claim for strict liability but denied as to the other claims.

### E.  Damages for Continuing Torts

ARCO contends that if the Court finds that the continuing tort doctrine applies to Diamond X's nuisance and trespass claims, Diamond X should be limited to loss-of-use

---

[13] *See People of the State of California v. Kinder Morgan Energy Partners, L.P.* (*Kinder I*), 569 F. Supp. 2d 1073, 1086 (S.D. Cal. 2008) ("Where an injury results from a negligent act and injury continues by reason of continued negligence, a recovery may be had for damages caused by the continuing negligence even if the claim for the original injury might be time barred.").

damages during the limitations period preceding commencement of this action and may not recover environmental cleanup costs or punitive damages. (ECF No. 228 at 31-32.) Diamond X contends that it can elect to pursue permanent nuisance and trespass claims at trial. (ECF No. 261 at 44.)

However, the Court has clearly limited these claims to continuing and not permanent torts. *See Capogeannis v. The Superior Court of Santa Clara Cty.*, 12 Cal. App. 4th 668, 679 (Cal. Ct. App. 1993) ("in a case in which the distinction between permanent and continuing nuisance is *close or doubtful* the plaintiff will be permitted to elect which theory to pursue") (emphasis added). Therefore, diminution in value damages are not available to Diamond X. Moreover, if Diamond X succeeds on the continuing nuisance and trespass claims and is able to demonstrate that its negligence and misappropriation of water rights claims also constitute continuing torts, then Diamond X is limited to damages incurred during the relevant limitations period prior to commencement of this action. *See Skokomish Indian Tribe*, 410 F.3d at 518; *see also People of the State of California v. Kinder Morgan Energy Partners, L.P.* (*Kinder II*), 159 F. Supp. 3d 1182, 1196-97 (S.D. Cal. 2016) (finding that where a nuisance or trespass is continuing, the injured party may seek damages for injuries occurring within the limitations period).

Diamond X also contends that it may recover the costs of abatement and restoration for all past contamination (ECF No. 261 at 44). However, the Court finds that Diamond X's recovery is limited to harm resulting from any contamination of the Property caused by the purported releases of AMD from the Mine or any increase in already existing contamination that occurred during the limitations period. The cases that Diamond X cites to rely on a California statute, Cal. Civ. Code §3334(a), allowing for the reasonable cost of restoration of a property to its original condition where there is wrongful occupation of real property. While the Court has looked to California case law in determining the application of the continuing tort doctrine to Diamond X's Nevada-based tort claims, the Court need not turn to a California statute as well to determine what form

17

of damages are permitted. The Court therefore limits damages to loss of use and enjoyment of the Property for the limitations period as well as any increases in contamination, if any, that were deposited on the Property during the limitations period.

Finally, Diamond X argues because its punitive damages claim is based on ARCO's conduct continuing to today, "including its ongoing failure to capture all sources of AMD, its decision to allow AMD to flow unabated for more than half of the year, and its continued failure to remediate downstream areas," punitive damages are appropriate. (ECF No. 261 at 46.) In Nevada, punitive damages are recoverable where there is "clear and convincing evidence that the defendant has been guilty of oppression, fraud or malice, express or implied." NRS § 42.005(1). The purpose of punitive damages is to punish the wrongdoer for his acts and to deter others from acting in a similar fashion. *N. Nevada Mobile Home Brokers v. Penrod*, 610 P.2d 724, 727 (Nev. 1980). Because Diamond X's allegations concern ARCO's conduct in treating and preventing the release of AMD and because there is a genuine issue of material fact about whether ARCO's actions or omissions resulted in releases from the Mine, including during the limitations period prior to commencement of this action, the Court declines to grant summary judgment so as to bar punitive damages.

### F. Conclusion

ARCO's SOL Motion is therefore granted in part and denied in part. It is granted as to the strict liability claim, which is barred by the statute of limitations, but denied as to Diamond X's state law tort claims for nuisance, trespass, negligence, and misappropriation of water rights.

### VI. TORT MOTION (ECF No. 230)

ARCO contends that: (1) Diamond X's tort claims should be limited to injuries and damages accruing after the date Diamond X acquired the Property; (2) Diamond X's tort claims should be limited to geographic locations where contamination attributable to the Mine is found; and (3) the Court should find in favor of ARCO on Diamond X's claims for public nuisance, trespass, and strict liability. (ECF No. 230 at 9-20.) Because the Court

1   has limited damages to the limitations period prior to commencement of this action and
2   found that the statute of limitations bars Diamond X's strict liability claim, the Court will
3   only address the three remaining issues raised in the Tort Motion.

### A.    Limiting Damages by Geography

5   ARCO argues that Diamond X's tort claims should be limited to geographic
6   locations where contamination attributable to the Leviathan Mind is found. (ECF No. 230
7   at 9-11.) The Court finds that disposing of this issue is premature as Diamond X must first
8   establish liability as to the contamination of certain portions of the Property and/or Bryant
9   Creek before any award of damages is granted.

10  Therefore, summary judgment is denied as to ARCO's request to limit damages
11  based on geographic location.

### B.    Public Nuisance Claim

13  ARCO argues that it is entitled to summary judgment on Diamond X's claim for
14  public nuisance because the contamination in Bryant Creek and contamination of soils
15  on the Property do not affect a considerable number of persons. (ECF No. 230 at 13-14.)
16  Diamond X responds that the contamination of Bryant Creek need not affect a
17  considerable number of persons under Nevada law, relying on Nevada's criminal statute
18  regarding public nuisance. (ECF No. 262 at 18.)

19  The Court disposes of this claim on a different basis than that raised by ARCO.
20  Specifically, in Nevada there is no private right of action for a public nuisance. *Coughlin*
21  *v. Tailhook Ass'n, Inc.*, 818 F. Supp. 1366, 1371-72 (D. Nev. 1993), *aff'd by Coughlin v.*
22  *Tailhook Ass'n*, 112 F.3d 1052 (9th Cir. 1997).

23  Therefore, summary judgment is granted in favor of ARCO as to Diamond X's
24  claim for public nuisance.

### C.    Trespass Claim

26  ARCO contends that it is entitled to summary judgment on Diamond X's trespass
27  ///
28  ///

1  claim because Diamond X permitted the entry of the contaminated water onto its land.[14]

2  (ECF No. 230 at 14.)

3        In Nevada, "trespass is an action for injury to [a] plaintiff's possession." *Rivers v.*

4  *Burbank*, 13 Nev. 398, 408 (Nev. 1878). To sustain a trespass action, a property right

5  must be shown to have been invaded. *Lied v. Clark Cty.*, 579 P.2d 171, 173-74 (Nev.

6  1978). Moreover, a plaintiff must show that the defendant "invaded the [plaintiff's]

7  property" in a "direct and tangible" way. *Palm Springs Transfer & Storage v. City of Reno*,

8  No. 51215, 2009 WL 3189239, at *5 (Nev. 2009) (unpublished disposition). ARCO relies

9  primarily on California case law in support of its position that Diamond X's diversion of

10  water by way of irrigation channels onto the Property amounted to consent to the

11  purported trespass and, therefore, the invasion of the Property was authorized. (ECF No.

12  230 at 14-15.) To the extent that ARCO relies on California law, its requirement that a

13  claim for trespass include an unauthorized or unconsented to entry amounts to a factual

14  dispute between the parties. For instance, while Diamond X consented to the entry of

15  water from Bryant Creek onto the Property, it is unclear if Diamond X consented to the

16  entry of AMD onto the Property.[15] Moreover, to the extent Bryant Creek passes through

17  parcels of the Property in Nevada, it is unresolved whether AMD from the Mine was

18  deposited onto those parcels or whether it damaged them.

19      **D.   Conclusion**

20        ARCO's Tort Motion is thus granted in part and denied in part. It is granted as to

21  Diamond X's public nuisance claim but is denied as to Diamond X's trespass claim and

22  as to limiting damages based on geographic location.

23  ///

24

25      [14]ARCO fails to account for the fact that part of the purported contamination concerns parcels of Diamond X's property that abut Bryant Creek.

26      [15]Diamond X contends that it ceased irrigating the Property with water from Bryant
27  Creek in 2007 because it suspected that water quality problems in Bryant Creek might be impacting its use of the land (ECF No. 262 at 20), lending support to it being factually disputed whether Diamond X consented to the entry of contaminants in the water onto
28  the River Ranch.

## VII.    LIABILITY MOTION (ECF No. 231-1)

Diamond X moves for partial summary judgment as to ARCO's liability under Section 107 of CERCLA[16] and ARCO's liability as to Diamond X's tort claims in the TAC. The Court addresses only whether liability as to Diamond X's private nuisance,[17] negligence, negligence per se, and misappropriation of water rights claims should be resolved on summary judgment because the remaining claims—trespass, strict liability, and public nuisance—have been addressed. *See* discussion *supra* Sec. VI(C), V(D) and VI(B). The Court finds that there is a genuine issue of material fact as to whether ARCO's acts or omissions caused injury to Diamond X. Therefore, summary judgment is denied as to these claims.

### A.    Causation

Nevada relies on the substantial factor test to determine legal or proximate causation. *See Holcomb v. Georgia Pac.*, 289 P.3d 188, 196 (Nev. 2012); RESTATEMENT (SECOND) OF TORTS § 431 (AM. LAW INST. 1965). To establish proximate causation, "it must appear that the injury was the natural and probable consequence of the negligence or wrongful act, and that it ought to have been foreseen in the light of the attending circumstances*." Yamaha Motor Co., U.S.A. v. Arnoult*, 955 P.2d 661, 664 (Nev. 1998) (citing *Crosman v. S. Pac. Co.*, 173 P. 223, 228 (Nev. 1918) (internal quotation marks omitted)). Moreover, "proximate causation is generally an issue of fact for the jury to resolve." *Id.* at 665 (citing *Nehls v. Leonard*, 630 P.2d 258, 260 (1981)).

Diamond X relies on an order from a recent California federal district court case, *Housing Auth. v. PCC Tech. Indus., Inc.*, No. 2:11-cv-01626-FMO-MRW (C.D. Cal. Oct.

///

///

---

[16]This portion of the Liability Motion is discussed in the section on ARCO's CERCLA I Motion, *see* discussion *infra* Sec. VIII.

[17]Diamond X argues in its motion that the Court should grant summary judgment on the basis of nuisance per se. (ECF No. 231-1 at 32-33.) Because Diamond X relies on California law in making this argument, the Court will not address it.

13, 2015),[18] to argue that the element of substantial factor causation should be found. (ECF No. 231-1 at 27.) In that case, certain defendants placed slag on the soil at the site, the slag contained arsenic and lead, and the arsenic and lead levels exceeded commercial and residential levels, thereby preventing redevelopment at the site. (*See* ECF No. 245-7 at 37-39.) Here, however, ARCO did not directly put AMD on the soil where there are now elevated levels of arsenic; rather, Diamond X took water contaminated with AMD from Bryant Creek and placed it on the Property itself.

Therefore, the Court finds that there is a genuine issue of material fact as to whether ARCO's conduct was the substantial factor in bringing about Diamond X's harm, precluding summary judgment in favor of Diamond X on Diamond X's private nuisance and negligence claims.[19]

### B.    Negligence Per Se[20]

Under Nevada law, violation of a statute may constitute negligence per se but only if (1) a plaintiff can show that a defendant has violated a duty imposed on him by a criminal or regulatory statute; (2) the plaintiff is a member of the class of persons intended to be protected by that law; and (3) the alleged harm is of the kind intended to be prevented by that law. *Weingartner v. Chase Home Fin., LLC*, 702 F. Supp. 2d 1276, 1290 (D. Nev. 2010); *see also Ashwood v. Clark Cty.*, 930 P.2d 740, 744 (Nev. 1997) ("A violation of statute establishes the duty and breach elements of negligence [per se] only if the injured

---

[18]This decision, which was issued on October 13, 2015, is not available through standard legal databases; therefore, the Court utilizes the ECF filing of the order that was filed in this case (ECF No. 245-7 at 27-44 (Exhibit II)) for citation purposes.

[19]Moreover, regarding the negligence and misappropriation of water rights claims, neither of the parties address whether ARCO's conduct during the relevant limitations period caused AMD to be released from the Mine such that it led to contamination (or further contamination) of the Property. Diamond X states that approximately 9 million gallons of AMD currently remain untreated and that, for at least half of the year, ARCO does not treat certain sources of AMD at the Mine. (ECF No. 285 at 15.) However, Diamond X fails to identify how releases during the limitations period resulted in damage to its land or impacted its water rights; instead, it focuses on how prior AMD releases impacted its use of irrigation water from Bryant Creek. (*See* ECF No. 285 at 18.)

[20]To the extent Diamond X points to California statutes as the basis for a claim of negligence per se (ECF No. 231-1 at 46), the Court declines to address its argument.

party belongs to the class of persons that the statute was intended to protect, and the injury is of the type against which the statute was intended to protect.").

Diamond X contends that ARCO is negligent per se because it has violated a Non-Time Critical Removal Action order from EPA by failing to implement year-round treatment of the Channel Underdrain and Delta Seep at the Mine. (ECF No. 231-1 at 36.) However, this document is not an order; rather, it is an internal memo sent from a regional site cleanup manager to the chief of the site cleanup branch at EPA. (ECF No. 249-4 at 3.) Assuming this memo amounts to a regulatory order for purposes of a negligence per se claim, ARCO points out that EPA withdrew the requirement of year-round treatment in 2009. (ECF No. 246-3 at 20, 51 (in force as of January 21, 2009).) Because Diamond X's continuing negligence claim requires ARCO to have breached a duty during the relevant limitations period, *see* discussion *supra* Sec. V(D), the Court finds an essential element of the negligence per se claim has not been satisfied.

Therefore, summary judgment is denied as to the negligence claim.

## C.      Wrongful Appropriation of Water Rights

ARCO argues that Diamond X is precluded from summary judgment on this claim because it has not established its ownership of rights to appropriate water from Bryant Creek. (ECF No. 258 at 45-46.) The Court agrees and finds there is a genuine issue of material fact as to whether Diamond X owns the water rights initially decreed to W. Brooks Park in the Alpine Decree. Specifically, Diamond X has not produced evidence that W. Brooks Park conveyed its rights to Diamond X. To the extent that Diamond X relies on a declaration of David Park stating that Diamond X is invoiced by the Water Master for water rights assessments for these water rights (ECF No. 235 at 2), this requires the Court to infer ownership. However, this issue is more properly before the trier of fact and not the Court for determination.

///

///

///

The Court declines to address Diamond X's additional arguments concerning the proper type of damages for its misappropriation of water rights claim,[21] whether ARCO has misappropriated the water by making it unsuitable for domestic purposes, and the appropriate standard to determine if ARCO has interfered with domestic water use. (*See* ECF No. 231-1 at 41-44.) Because the Court determined that there is a genuine factual dispute concerning whether misappropriation of water rights is a continuing tort, *see* discussion *supra* Sec. V(D), it would be premature for the Court to determine how to assess damages or the appropriate standard for doing so. Therefore, the Court denies summary judgment as to Diamond X's claim for wrongful appropriation of water rights.

### D.    Conclusion

Diamond X's Liability Motion is thus denied. The Court finds there is a genuine issue of material fact as to Diamond X's remaining state law tort claims, thereby precluding summary judgment.

## VIII.    CERCLA I MOTION (ECF No. 229)

Both Diamond X and ARCO move for summary judgment on Diamond X's seventh and eighth claims asserted under CERCLA. (ECF No. 231-1 at 17-24; ECF No. 248 at 10.) As to Diamond X's seventh claim, the Court finds that there is a genuine issue of material fact as to whether investigatory costs incurred by Diamond X before the River Ranch's inclusion in the EPA-approved study area in 2012 are recoverable but finds that costs incurred by Diamond X after the River Ranch became part of the EPA-approved study area are duplicative and therefore not recoverable. As to Diamond X's eighth claim, the Court declines to resolve this issue on summary judgment because it is unclear at this time if the Property will become part of an EPA-ordered remedial cleanup carried out by ARCO.

///

---

[21]The Court notes, however, that if Diamond X successfully demonstrates that ARCO's actions or omissions resulted in misappropriation during the relevant limitations period, Diamond X is limited to damages incurred during that period up until commencement of this action.

### A.    Statutory Framework

CERCLA, 42 U.S.C. § 9601 *et seq.*, is a statutory scheme giving the federal government broad authority to require responsible parties to clean up contaminated soil and groundwater. *See Key Tronic Corp. v. United States*, 511 U.S. 809, 814 (1994). "CERCLA's goal . . . is not simply to encourage private response, but rather 'to make the party seeking response costs choose a cost-effective course of action to protect public health and the environment' and to achieve 'a CERCLA-quality cleanup." *City of Colton v. Am. Promotional Events, Inc.-W.*, 614 F.3d 998, 1008 (9th Cir. 2010) (citing *Carson Harbor Vill. v. Cty. of Los Angeles* (*Carson Harbor II*), 433 F.3d 1260, 1265 (9th Cir. 2006)).

"CERCLA provides two mechanisms for private parties to recover their environmental cleanup expenses from other parties." *Whittaker Corp. v. United States* (*Whittaker II*), 825 F.3d 1002, 1006 (9th Cir. 2016). First, Section 107 allows for "cost recovery" actions against PRPs to recover costs, including any "necessary costs of response incurred by any other person consistent with the national contingency plan." 42 U.S.C. §9607(a)(4)(B). Second, "113(f)(1) authorizes a contribution action to PRPs with common liability stemming from an action instituted under . . . § 107(a)." *United States v. Atl. Research Corp.*, 551 U.S. 128, 129 (2007).

In order for Diamond X to prevail on its Section 107 claim, it must establish: "(1) the site on which the hazardous substances are contained is a facility under CERCLA's definition of that term, 42 U.S.C. § 9601(9); (2) a release or threatened release of any hazardous substance from the facility has occurred, 42 U.S.C. § 9607(a)(4); (3) such release or threatened release has caused Diamond X to incur response costs that were necessary and consistent with the national contingency plan ("NCP"), 42 U.S.C. § 9607(a)(4) & (A)(4)(B); and (4) ARCO is within one of four classes of persons subject to the liability provisions of Section 107(a)." *City of Colton*, 614 F.3d at 1002-3 (internal quotation marks and citation omitted). Moreover, where the response costs are incurred at a site distinct from the facility at which the original disposal occurred—such as here—

the moving part must: (a) identify a contaminant at its site; (b) identify the same or a chemically similar contaminant at the original facility; and (c) provide evidence of a plausible migration pathway by which the contaminant may have travelled from the original facility to the site. *Castaic Lake Water Agency v. Whittaker Corp.* (*Whittaker I*), 272 F. Supp. 2d 1053, 1066 (C.D. Cal. 2003).

### B.    Response Costs

Diamond X is seeking all past investigatory costs and non-litigation costs under Section 107. (ECF No. 296.) At issue in both Diamond X's Liability Motion and ARCO's CERCLA I Motion is whether the costs incurred by Diamond X are recoverable. (*See* ECF No. 258 at 15-19; *see also* ECF No. 229 at 10-18.) While ARCO contends these costs are neither necessary nor consistent with the NCP, the Court focuses exclusively on whether these costs are duplicative and therefore not necessary.

Response costs are considered "necessary" when "an actual and real threat to human health or the environment exist[s]." *Carson Harbor Vill., Ltd. v. Unocal Corp.* (*Carson Harbor I*), 270 F.3d 863, 871 (9th Cir. 2001) (en banc). "[C]ourts will deny recovery where the costs incurred were duplicative of other costs, wasteful, or otherwise unnecessary to address the hazardous substances at issue." *Waste Mgmt. of Alameda Cty., Inc. v. East Bay Reg'l Park Dist.*, 135 F. Supp. 2d 1071, 1099 (N.D. Cal. 2001). "Generally, investigative costs incurred by a private party after EPA has initiated a remedial investigation unless authorized by EPA are not considered necessary because they are 'duplicative' of the work performed by EPA." *United States v. Iron Mountain Mines, Inc.*, 987 F. Supp. 1263, 1272 (E.D. Cal. 1997) (internal quotation marks and citation omitted).

In its response to ARCO's CERCLA I Motion, Diamond X points out that it conducted studies of the River Ranch beginning in 2005 to determine the environmental condition of the Property. (ECF No. 261 at 9-10.) However, it was not until August of 2012, when Diamond X hired a consulting firm, McGinley and Associates ("MGA"), to perform targeted soil sampling of the Property that Diamond X learned that concentrations of

arsenic were elevated so as to preclude its development plans for the Property and require extensive remediation. (*Id.* at 10.) Diamond X then reported the discovery of contamination levels to NDEP. (*Id.*) Diamond X contends that starting in 2015 it began to investigate under NDEP oversight, that EPA was informed of Diamond X's independent response action, and that EPA approved Diamond X proceeding with this independent action. (*Id.*)

The initial studies that Diamond X undertook after it acquired the Property may meet the definition of investigatory costs and thus may be recoverable under CERCLA.[22] *See Wickland Oil Terminals v. Asarco, Inc.*, 792 F.2d 887, 892 (9th Cir. 1986) (expenses incurred by present owner in testing site could be recovered under CERCLA). However, in February of 2012 ARCO submitted an Off-Property Focused Remedial Investigation Work Plan to EPA, focusing on determining health risk to persons, and explicitly included the River Ranch in the off-site study area. (ECF No. 227-3.) EPA did not authorize Diamond X to perform its own separate investigation prior to Diamond X doing so in August of 2012; rather, Diamond X performed the MGA study even though in November of 2011 EPA informed them that the areas of the Property that had been irrigated with Bryant Creek water would be included in the study area (ECF No. 264 at ¶ 5). *See Louisiana-Pac. Corp. v. Beazer Materials & Servs., Inc.*, 811 F. Supp. 1421, 1425 (E.D. Cal. 1993) (finding that to allow a party to recover investigation costs incurred after EPA explicitly informed them of its intent to conduct an investigation but before that investigation began would impermissibly allow that party to double the response costs). While Diamond X notified EPA of its actions after the MGA study, there is no evidence that EPA approved the MGA study as part of the remedial investigation into supplemental areas contaminated by the Mine or any subsequent actions taken by Diamond X. (*See* ECF No. 227-17 at 6-10; *see also* ECF No. 254-1 at 21-23, 28-30.) Moreover, EPA has explicitly stated that it has not approved the response actions taken by Diamond X or its

---

[22]The Court does not address whether claims for some of these costs are barred by the statute of limitations as the issue was not raised in the briefs.

proposed remedial action. (ECF No. 277-6 at 2.) The Court therefore finds that any investigatory costs incurred by Diamond X after EPA approved the Property as part of ARCO's remedial investigation study area are duplicative and thus not recoverable.

To the extent that Diamond X contends there are triable issues of fact as to whether the costs it incurred are duplicative, the Court disagrees as to those costs incurred past February 2012. Diamond X relies on *United States v. Newmont USA Ltd.*, 504 F. Supp. 2d 1077 (E. D. Wash. 2007). (ECF No. 260 at 13.) However, that case involved an instance where the United States government sought to recover response costs that were potentially duplicative of studies performed by another party before EPA added the site to the National Priorities List and that the party had performed through an agreement with the Bureau of Land Management. *See United States v. Newmont USA Ltd.*, 504 F. Supp. 2d at 1080, 1085. Here, by contrast, Diamond X performed many of its studies while the EPA-approved remedial investigation of the Property was ongoing.

Therefore, the Court finds that there are genuine issues of material fact as to whether Diamond X may recover costs incurred prior to February 2012 but that costs incurred after that time are not recoverable.

## C. Future Costs

Section 113(g)(2) provides that in any initial cost-recovery action under Section 107, "the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." 42 U.S.C. § 9613(g)(2). After establishing liability under Section 107, a plaintiff can "obtain reimbursement for initial outlays, as well as a declaration that the responsible party will have continuing liability for the cost of finishing the job." *In re Dant & Russell v. Burlington N. Railroad Co.*, 951 F.2d 246, 249-50 (9th Cir. 1991); *see also Whittaker I*, 272 F. Supp. 2d at 1059 (finding that a court may grant declaratory relief for future costs once a plaintiff has incurred at least some recoverable response costs).

///

Diamond X's eighth claim for relief seeks future response costs of between approximately $70 and $128 million. (ECF No. 175 at ¶¶ 91-94.) ARCO seeks summary judgment, arguing that because Diamond X cannot show its previously incurred response costs were necessary and consistent with the NCP, Diamond X cannot establish that it has a right to a declaratory judgment under § 113(g)(2) for future response costs. (ECF No. 229 at 19.)

The Court denies summary judgment as to future response costs for two reasons. First, because the Court finds a genuine issue of material fact exists to preclude Diamond X's recovery of costs incurred before February 2012, the same finding would necessarily preclude summary judgment on future response costs. Diamond X may very well receive recovery of costs incurred before 2012, which may affect Diamond X's entitlement to claim future response costs, but in light of the fact that ARCO has not recommended any remedial action at the Property nor has a consent decree been entered into by ARCO to clean up the Property (*see* ECF No. 246 at 15 ("*If*, based on these investigations, EPA determines that CERCLA remedial action is required on the Property, it is reasonably likely that EPA will require [ARCO] to perform the remedial action") (emphasis added); *see also* ECF No. 227-7 at 14-15 (identifying irrigated portions of the River Ranch as part of the supplemental study area)), it is unclear to the Court whether Diamond X is precluded from recovering future response costs. Therefore, the Court denies summary judgment as to this claim.

### D. Conclusion

ARCO's CERCLA I Motion is therefore granted in part and denied in part. It is granted insofar as Diamond X is precluded from recovering costs it incurred after February 2012 but it is denied insofar as there is a genuine issue of material fact as to whether Diamond X may recover costs incurred before February 2012. Therefore, the motion is also denied as to Diamond X's eighth claim as it is unclear whether Diamond X may recover future costs as this point in time.

///

**IX.    CERCLA II MOTION (ECF No. 248)**

ARCO moves for partial summary judgment as to Diamond X's and Park Livestock's CERCLA liability on the basis that both are covered persons under Section 107(a). (ECF No. 248 at 19.) The Court agrees.

**A.    Background**

In its Counterclaim/Third-Party Complaint, ARCO alleges that Diamond X and Park Livestock's operation of the irrigation system headgates allowed water from Bryant Creek to flow onto the Property, which were then transported across the property via man-made irrigation ditches and deposited onto certain areas of the Property, allowing hazardous substances into the irrigation system and the soils on the Property. (ECF No. 179 at 21.) ARCO also alleges that Diamond X and Park Livestock removed sediment containing hazardous substances from the irrigation ditches, which Diamond X and Park Livestock then deposited directly onto the soil and vegetation down gradient from the ditches both on the Property and on other properties. (*Id.* at 22.) This resulted in the release or threatened release of hazardous substances on the Property and other properties surrounding it. (*Id.*)

In their joint response, Diamond X and Park Livestock contend that Park Livestock is not an operator, both Diamond X[23] and Park Livestock are entitled to the third party defense, and Diamond X is entitled to the contiguous property owner defense.

**B.    Statutory Framework**

In order to recover under either Section 107 or 113 of CERCLA, ARCO must establish that Diamond X and Park Livestock are each within one of the four classes of persons subject to the liability provisions of Section 107(a). *See City of Colton*, 614 F.3d at 1002-3 (§ 107(a) claim); *see also AmeriPride Servs. Inc. v. Texas E. Overseas Inc.*, 782 F.3d 474, 480 (9th Cir. 2015) (§ 113(f)(1) claim).

///

---

[23]By asserting defenses, Diamond X concedes that it is a PRP.

### C. Operator Liability of Park Livestock

The Court finds that Park Livestock falls within the meaning of "former operator" of a facility from which there is a release or threatened release of a hazardous substance.

Former operators include "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of[.]" 42 U.S.C. § 9607(a)(2). The Supreme Court clarified this definition by finding that "an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *United States v. Bestfoods*, 524 U.S. 51, 66-67 (1998). The Court found that CERCLA "must be read to contemplate 'operation' as including the exercise of direction over the facility's activities." *Id.* at 71. The Supreme Court's clarification of the meaning of "former operator" followed the Ninth Circuit's earlier definition of an operator as any party with the "authority to control the cause of the contamination at the time the hazardous substances were released into the environment." *Kaiser Aluminum & Chem. Corp. v. Catellus Dev. Corp.*, 976 F.2d 1338, 1341 (9th Cir. 1992). The Ninth Circuit's "operator" definition has been held to be consistent with *Bestfoods*' definition. *See City of Los Angeles v. San Pedro Boat Works*, 635 F.3d 440, 451-52 (9th Cir. 2011).

Park Livestock contends that its operations were exclusively related to cattle grazing and that it was the owner of the Property, W. Brooks Park, who determined how and when to irrigate; therefore, at the very least "there are triable issues of fact concerning whether Park Livestock was ever responsible for or in control of operations specifically related to pollution." (ECF No. 260 at 21-23.) The Court resolved the first contention in a previous order. There, the Court determined that placing and depositing water containing hazardous substances onto the Property, removing sediment containing hazardous materials from the irrigation ditches, and placing or discarding these materials on the Property were specifically related to pollution and constitute a disposal under CERCLA for purposes of operator liability. (*See* ECF No. 224 at 14-21.)

31

As for Park Livestock's contention that it lacked control over the operation of the irrigation system, the undisputed evidence does not help it. Park Livestock admitted in its Answer to ARCO's Third-Party Complaint that it actively operated the irrigation system, determining if, when, where, and how much water from Bryant Creek was deposited on the Property. (ECF No. 226 at ¶¶ 10, 12-13.) Park Livestock also admitted in its Answer that it removed sediment from the irrigation system and placed it elsewhere on the Property, stating in its Answer that "as a matter of periodic maintenance to improve water flow, Park Livestock infrequently, but at times, removed sediment from the ditches and placed it on the downgradient side of the irrigation ditch" and that, at times, "it used a backhoe for maintenance of an irrigation ditch." (ECF No. 226 at ¶¶ 15-16.)

In addition, there is deposition testimony of David and W. Bruce Park that a Park Livestock employee operated the irrigation system for "40-some-odd years," and that the employee "didn't really need any instructions" on how to operate the system, as it required only one person to perform the job, which this particular employee did every day.[24] (ECF No. 227-38 at 7-8; ECF No. 227-57 at 3.) To the extent that this employee was directed by W. Brooks Park, Brooks was not only the owner of the Property but also a part owner in Park Livestock at some point in time. (*See* ECF No. 227-38 at 8; *see* ECF No. 226 at ¶ 6 ("Park Livestock admits that its shareholders historically included members of the Park family").) The fact that a Park Livestock employee actually operated the system is what is relevant; Park Livestock offers no legal authority to support its suggestion that because this employee was instructed at times by someone once affiliated with the company, the company is therefore not responsible for its employee's actions where those actions were his responsibility as an employee and occurred within the course of his employment.[25] Moreover, David Park admitted in his deposition that he had, as a part

---

[24]A second employee took over the position of operating the irrigation system before the company ceased irrigating the Property. (ECF No. 227-38 at 8.)

[25]The case law Park Livestock cites would be helpful if ARCO was asking that the particular employee be found liable as a PRP; otherwise, these cases are not on point as to this particular issue.

owner of Park Livestock, opened the irrigation headgates at times and decided when to irrigate. (*See* ECF No. 227-38 at 7-8.)

In sum, given Park Livestock's admissions in its Answer and its representative's deposition testimony, there is no dispute that Park Livestock controlled the irrigation system on the Property.

### D. Third Party Defense

Neither Diamond X nor Park Livestock are entitled to the third party defense because the evidence is undisputed that the release of AMD from the Leviathan Mine was not the sole cause of the pollution on the Property.

The third party defense, also known as the innocent landowner defense, requires a showing (1) that the release or threat of release of hazardous substances was caused solely by the acts of a third party, (2) that the third party was not an employee or agent of Diamond X or Park Livestock, and (3) that Diamond X and Park Livestock exercised due care with respect to the hazardous substances and took precautions against foreseeable third-party acts or omissions. *Whittaker I*, 272 F. Supp. 2d at 1079-80; 42 U.S.C. § 9607(b)(3). This defense is construed narrowly to further CERCLA's broad remedial purposes. *Carson Harbor I*, 270 F.3d at 883; *Lincoln Props., Ltd. v. Higgins*, 823 F. Supp. 1528, 1539 (E.D. Cal. 1992). In order to defeat summary judgment, Diamond X and Park Livestock "must come forward with evidence sufficient to create a genuine issue of material fact" as to this defense. *Whittaker I.*, 272 F. Supp. 2d at 1080 (citing *Dig. Control Inc. v. McLaughlin Mfg. Co., Inc.*, 248 F. Supp. 2d 1015, 1017 (W.D. Wash. 2003)).

Diamond X and Park Livestock contend that there are triable issues of fact as to whether ARCO was the sole cause of the release of hazardous substances because neither Diamond X nor Park Livestock, or any member of the Park family, discovered that irrigated water had caused a release of contaminants on the property until 2012. (*See* ECF No. 261 at 25.) Therefore, Diamond X and Park Livestock reason, the parties were not the proximate cause of the release of hazardous substances because the release was not a foreseeable consequence of their actions. (*See id.* at 23.) They reach this

conclusion in part by relying on *Lincoln Properties Ltd v. Higgins*, 823 F. Supp. 1528 (E.D. Cal. 1992). In that case, the district court held that "caused solely by" incorporates the concept of proximate cause such that "[i]f the [party requesting use of the defense]'s release was not foreseeable" then the third party defense may be available. 823 F. Supp. at 1542. However, the court also stated that in order to meet the first element of the third party defense, the party's release must not only be unforeseeable but its conduct must be "indirect and insubstantial" in the chain of events leading to the release. *Id.* at 1542-43. The court found that the defense was available based on the fact that there was no evidence of conduct by the party that contributed to the releases, which were minimal. *Id.*; *see also Whittaker I*, 272 F. Supp. 2d at 1081. Here, the extent of the soil contamination on the Property[26] would not have occurred but for the actions of Diamond X and Park Livestock in opening the irrigation system's headgates and displacing sediment from the irrigation ditches onto other parts of the Property. *See* discussion *supra* Sec. IX(C).

Moreover, the Court disagrees with the parties that their activities were indirect and insubstantial. (ECF No. 261 at 26.) Park Livestock leased the Property beginning in 1974, and Diamond X continued to irrigate[27] the Property with contaminated water from Bryant Creek for four years after acquiring the land, not an insignificant amount of time given that the company has only existed for fourteen years. Park Livestock also admitted to moving sediment from the irrigation ditches onto other parts of the Property. In addition, in 2005

---

[26]In arguing for this defense, Diamond X and Park Livestock make no claims about contamination above EPA levels in the parcels abutting Bryant Creek.

[27]As Diamond X stated in its TAC, the Property has been "historically owned and ranched by the same family for more than 100 years," and those portions of the property that were ranched were also "historically flood irrigated" with water diverted from Bryant Creek through an irrigation ditch "originally dug in the late 1800s or early 1900s." (ECF No. 175 at 7.) The fact that Diamond X was created in 2003 and only irrigated the land with water from Bryant Creek for four years does not make the release of contaminants insubstantial, as it notes that the company inherited the property from W. Brooks Park Trust upon the death of W. Brooks Park, who is the grandfather of David Park and W. Bruce Park. (ECF No. 262 at 9; ECF No. 235 at ¶ 4.) Both David and W. Bruce indirectly own Diamond X (through David's LLC and W. Bruce's trust) in addition to owning Park Livestock.

Diamond X was on notice that contamination in Bryant Creek had interfered with use of its water rights; therefore, it was not unforeseeable that continued use of the water would contaminate the Property.

Therefore, the third party defense is not available to Diamond X and Park Livestock.

### E.    Contiguous Property Owner Defense

Diamond X also contends that it qualifies for the contiguous property owner defense under Section 107(q), 42 U.S.C. § 9607(q). (ECF No. 260 at 28-29.) The Court disagrees. Because this defense also relies on Diamond X not causing or contributing to the release of the hazardous substances onto the Property, § 9607(q)(1)(A)(i), this defense is also unavailable. *See* discussion *supra* Sec. IX(D).

### F.    Conclusion

Therefore, ARCO's CERCLA II Motion is granted. Both Diamond X and Park Livestock are covered persons for purposes of liability under Section 107. Furthermore, the third party and contiguous property owner defenses are not available to Diamond X or Park Livestock.

## X.    CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the parties' motions.

It is therefore ordered that ARCO's Motion for Summary Judgment on Diamond X's Tort Claims as Barred by the Statute of Limitations (ECF No. 228) is granted in part and denied in part.

It is further ordered that ARCO's Motion for Summary Judgment on Diamond X's Seventh and Eighth Claims under CERCLA (ECF No. 229) is granted in part and denied in part.

///

It is further ordered that ARCO's Motion for Summary Judgment to Limit or Dismiss Diamond X's Tort Claims (ECF No. 230) is granted in part and denied in part.

It is further ordered that Diamond X's Motion for Partial Summary Judgment Concerning ARCO's Liability as to CERCLA and Certain Common Law Claims (ECF No. 231) is denied.

It is further ordered that ARCO's Motion for Partial Summary Judgment on ARCO's CERCLA Claims against Diamond X and Park Livestock (ECF No. 248) is granted.

DATED THIS 29th day of September 2017

_____
MIRANDA M. DU
UNITED STATES DISTRICT JUDGE