UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| DIAMOND X RANCH LLC, | Case No. 3:13-cv-00570-MMD-WGC |
| Plaintiff/Counterclaim Defendant, | ORDER |
| v. | |
| ATLANTIC RICHFIELD COMPANY, | |
| Defendant/Counterclaimant/ Third-Party Plaintiff, | |
| v. | |
| PARK LIVESTOCK CO., | |
| Third-Party Defendant. | |

## I. INTRODUCTION

This action concerns alleged contamination of Plaintiff Diamond X Ranch, LLC's ("Diamond X") property through releases of acid mine drainage ("AMD") from Defendant Atlantic Richfield Company ("ARCO") owned Leviathan Mine. Pursuant to LR 16-3 and Paragraph 2 of the Court's Order Regarding Trial in Civil Cases (ECF No. 319), both Diamond X and ARCO have filed consolidated motions in limine. (ECF Nos. 339, 340.) Both parties also filed respective oppositions. (ECF Nos. 344, 346.)

For the reasons discussed herein, Diamond X's motion in limine is granted in part and denied in part and ARCO's motion in limine is granted in part and denied in part.

## II. BACKGROUND

The Court incorporates the relevant background facts set forth in the Court's previous order. (ECF No. 300 at 2-4.)

# III.    LEGAL STANDARDS

A motion in limine is a procedural mechanism made in advance to limit testimony or evidence in a particular area. *United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir.2009). It is a preliminary motion that is entirely within the discretion of the Court. *See Luce v. United States*, 469 U.S. 38, 41-42 (1984). To exclude evidence on a motion in limine, "the evidence must be inadmissible on all potential grounds." *See, e.g., Ind. Ins. Co. v. Gen. Elec. Co.*, 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004). "Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *Hawthorne Partners v. AT & T Tech., Inc.*, 831 F. Supp. 1398, 1400 (N.D. Ill. 1993). This is because although rulings on motions in limine may save "time, cost, effort and preparation, a court is almost always better situated during the actual trial to assess the value and utility of evidence." *Wilkins v. Kmart Corp.*, 487 F. Supp. 2d 1216, 1218 (D. Kan. 2007).

In limine rulings are provisional. Such "rulings are not binding on the trial judge . . . [who] may always change h[er] mind during the course of a trial." *Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000). "Denial of a motion in limine does not necessarily mean that all evidence contemplated by the motion will be admitted to trial. Denial merely means that without the context of trial, the court is unable to determine whether the evidence in question should be excluded." *Ind. Ins. Co.*, 326 F. Supp. 2d at 846.

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401. Only evidence that is relevant is admissible. Fed. R. Evid. 402. Relevant evidence may still be inadmissible "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "Unfairly prejudicial" evidence is that which has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."

*United States v. Gonzalez-Flores,* 418 F.3d 1093, 1098 (9th Cir. 2005) (quoting *Old Chief v. United States*, 519 U.S. 172, 180 (1997)).

IV.    **DIAMOND X'S MOTION IN LIMINE (ECF No. 340)**

   A. **Evidence of Any Potential Remedy Guided by the Environmental Protection Agency ("EPA") at the River Ranch**

   Diamond X moves "to exclude testimony or other evidence regarding any potential EPA-guided remedy at [the] River Ranch . . . that may theoretically occur in the future under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA")." (ECF No. 340 at 7.)  ARCO responds that "[t]he parties agree that the cost and scope of any future EPA-ordered CERCLA remedy on the [River Ranch] should not be presented to the jury," but adds two clarifications. (ECF No. 344 at 2.)

   First, ARCO argues that this evidence is "relevant to the parties' CERCLA claims for past and future response costs" during the bench phase of the trial and should be presented outside the scope of the jury. (*Id.*)  ARCO raised this issue for the first time in its opposition; therefore, Diamond X did not address the issue in its motion in limine. (*See* ECF No. 340 at 7-8 (arguing exclusively that evidence of a future EPA-guided cleanup at the River Ranch is purely conjectural and is irrelevant to Diamond X's common law claims).)  Regardless, the Court defers ruling on this issue until the bench phase of the trial.

   Second, ARCO argues that it "should be allowed to explain to the jury that [the Nevada Department of Environmental Protection ("NDEP")] and EPA will hold [ARCO] responsible—as a liable party under CERCLA and as the company currently performing CERCLA early response actions, the remedial investigation, and the feasibility study—for any CERCLA remedy selected by EPA for the [River Ranch] (whatever that remedy may be or its cost)." (ECF No. 344 at 2.)  ARCO posits that its responsibility for future cleanup costs is not conjectural at least as to NDEP, which "has made clear it will require [ARCO] to clean up the [River Ranch] to Nevada regulatory standards." (*Id.* at 3.)  ARCO contends that because it will be responsible for any future remedial action, this is relevant insofar

as Diamond X will not need to incur any expenses for restoring its property and if Diamond X does incur expenses, they will be unnecessary. (*Id.*)  The Court fails to see how future remedial costs incurred by ARCO pursuant to NDEP's or even EPA's direction is relevant to an evaluation of Diamond X's continuing torts, for which Diamond X can recover only lost use damages incurred during the relevant limitations period. (ECF No. 300 at 17-18.)  The Court therefore will not permit ARCO to explain to the jury that NDEP or EPA will hold ARCO responsible for future cleanup costs.

The Court therefore grants Diamond X's motion.  The Court will exclude any evidence pertaining to the cost and scope of a future NDEP- or EPA-ordered remedy during the jury phase of the trial.

### B.  Testimony of Joyce Tsuji, Ph.D., and David J. Folkes, P.E.

ARCO designated Joyce Tsuji, Ph.D., to provide expert testimony on the risks to human health and the environment from contaminants such as arsenic on the River Ranch. (ECF No. 340 at 10.)  Diamond X now moves to preclude Dr. Tsuji from offering at trial opinions that: (1) suggest a health-protective arsenic soil concentration for the River Ranch; (2) suggest a cleanup level for the River Ranch; (3) involve calculations that support a risk assessment and (4) relate to cleanup levels that EPA has selected for other contaminated sites. (*Id.* at 9.)  Diamond X moves to exclude these opinions on the basis that "Dr. Tsuji did not apply any scientifically reliable method to determine a health-protective arsenic soil concentration (and hence, cleanup level) for [the] River Ranch; she failed to provide any calculations whatsoever in her expert reports or deposition testimony; and her opinions based on cleanup levels at other contaminated sites are unhelpful and prejudicial." (*Id.*)  As a result, Diamond X also moves to preclude David J. Folkes, P.E., from "offering opinions based on Dr. Tsuji'' purported cleanup level of 250 ppm and 1,000 ppm for [the] River Ranch including: (1) the extent of soil contamination above those levels on [the] River Ranch; (2) any remedy based on that amount of contamination (e.g., deep tilling and limited excavation); and (3) costs associated with

///

such remedy." (*Id.*)  The Court agrees with ARCO and denies Diamond X's motion as to this evidence.

### i.  Legal Standard for Expert Testimony

Under Rule 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.  The Supreme Court provided additional guidance on Rule 702 in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).  In *Daubert*, the Court held that scientific testimony must be reliable and relevant to be admissible. *Daubert*, 509 U.S. at 589. *Kumho Tire* clarified that *Daubert*'s principles also apply to technical and specialized knowledge. *See Kumho*, 526 U.S. at 141.

Under *Daubert*, a court may use the following factors to assess reliability: whether a scientific theory or technique can be (and has been) tested; whether the theory or technique has been subjected to peer review and publication; the known or potential rate of error and the existence and maintenance of standards controlling the techniques operation; and whether the technique is generally accepted. *Daubert*, 509 U.S. at 593-94.  However, the "test of reliability is 'flexible,' and *Daubert*'s list of specific factors neither necessarily or exclusively applies to all experts or in every case." *Kumho*, 526 U.S. at 141.  The trial court has "considerable leeway" in deciding how to determine the reliability of an expert's testimony and whether the testimony is in fact reliable. *Id.* at 152.  An expert's area of competence must match the subject matter of her testimony. *See United States v. Chang*, 207 F.3d 1169, 1172-73 (9th Cir. 2000) (affirming exclusion of experts' opinion that security was not counterfeit where he was only an expert in the history of securities and not an expert in detecting counterfeits).

The Ninth Circuit has emphasized that "Rule 702 is applied consistent with the liberal thrust of the Federal Rules and their general approach of relaxing the traditional barriers to opinion testimony." *Jinro Am. Inc. v. Secure Investments, Inc.*, 266 F.3d 993, 1004 (9th Cir. 2001), *opinion amended on denial of reh'g*, 272 F.3d 1289 (9th Cir. 2001) (citations and internal quotation marks omitted). "An expert witness—unlike other witnesses—is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation, so long as the expert's opinion has a reliable basis in the knowledge and experience of his disciplines." *Id.* (citations and internal quotation marks omitted). Shaky but admissible evidence should not be excluded but instead attacked through cross-examination, contrary evidence, and attention to the burden of proof. *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010), *as amended* (Apr. 27, 2010).

### ii. Dr. Tsuji's Opinions

Dr. Tsuji is a toxicologist. (ECF No. 344 at 4.) Diamond X argues that Dr. Tsuji's opinions should be excluded in part because she did not apply a reliable methodology to arrive at her projected values of what levels of arsenic soil concentration would protect human health and agricultural use on the River Ranch. (ECF No. 340 at 10.) The standard methodology to assess the risks from a contaminated site is a risk assessment, and Dr. Tsuji admitted she did not perform one and that one should be performed. (*Id.*) Diamond X further argues that Dr. Tsuji did not explain the method she used to compare the various contaminated sites, that she provided "limited details pertaining to each site," and that she neglected to account for site-specific factors such as varying background concentrations of arsenic, regulatory restrictions on expense and technical feasibility, and government imposed deed restrictions constraining the use of the River Ranch. (*Id.* at 12.) Finally, Diamond X points outs that Dr. Tsuji relied heavily on EPA-approved clean up data at the Anaconda Smelter site in Montana ("Montana Site") but that she failed to explain "whether exposure at [the] River Ranch would be different or similar to the Montana Site and instead testified in her deposition that "she applied the cleanup level from the Montana [S]ite to [the] River Ranch because she 'know[s] exactly how the

calculations result in the 250 ppm for [the Montana Site]' and that, because the equations are 'not complicated,' she knew the assumptions used for the Montana [S]ite would be protective for [the] River Ranch." (*Id.* at 13 (quoting ECF No. 340-2 at 8-12).)

ARCO responds that Dr. Tsuji is qualified to offer her opinions (which Diamond X does not dispute), utilized a methodology reasonably relied upon by toxicologists in her field, and that Diamond X's argument ultimately goes to the weight, not the admissibility, of Dr. Tsuji's testimony. (ECF No. 344 at 5.) More specifically, ARCO points to the multiple analyses, techniques, and lines of evidence Dr. Tsuji relied on that are of the type reasonably relied upon by a toxicologist in her field, such as: (1) the "arsenic cleanup levels accepted by EPA or state regulatory agencies at sixteen western mining and smelting sites in the United States, where studies have been conducted to derive risk assessment assumptions and characterizes exposures"; (2) "the arsenic level accepted by EPA for the Anaconda Site" based on "extensive studies . . . on soils, house dust, arsenic bioavailability in laboratory animals, soil ingestion rates in children, and biomonitoring to support risk assessment assumptions," epidemiological studies, and EPA's health risk assessment for arsenic in residential soil; (3) site-specific conditions at the Montana Site compared to those at the River Ranch (accounting for arsenic bioavailability, relative sizes of affected areas, effects of climate conditions on potential exposure rates, and the source of the arsenic); (4) the extent to which EPA's assumptions at the Montana Site overestimate the health risk to children and adults; (5) toxicological and epidemiological studies on health-based metrics among persons exposed to varying degrees of arsenic in soil and water; and (6) the relative amounts of arsenic that a person would be exposed to if living on soil containing 250 ppm arsenic compared to background arsenic intake from diet and water that people are normally exposed to. (ECF No. 344 at 6-7.)

Based on the variety of scientifically-accepted methodologies utilized by Dr. Tsuji, the Court agrees with ARCO that Diamond X's critique that Dr. Tsuji did not perform a risk assessment ultimately goes to the weight of her opinions. *See Kennedy v. Collagen*

*Corp.*, 161 F.3d 1226, 1231 (9th Cir. 1998) (finding that arguments about whether a qualified expert used a certain technique or considered specific data go to the weight and not the admissibility of her opinions). Dr. Tsuji's opinions may be "attacked through cross-examination, contrary evidence, and attention to the burden of proof," but the Court finds that her opinions are still admissible. See *Primiano*, 598 F.3d at 564.

Diamond X also argues that Dr. Tsuji's opinions are not "grounded in the realities of [the] River Ranch" and speculates that facts specific to the River Ranch may differ, such as the allowable residential risk level, background arsenic levels, date of remediation, institutional controls, and technical feasibility/cost. (ECF No. 340 at 14.) However, Diamond X's critique again goes to the weight of Dr. Tsuji's opinions. Diamond X may cross-examine Dr. Tsuji as to how the River Ranch may be distinguishable from other contaminated sites to support her opinions.

Diamond X's motion is therefore denied as to Dr. Tsuji's opinions.

   *iii.* *Folkes' Opinions*

Diamond X seeks to exclude Folkes' opinions primarily because he relies on the 250 ppm clean up level that Dr. Tsuji selected. (ECF No. 340 at 14.) Diamond X's motion is denied because the Court has declined to exclude Dr. Tsuji's opinions.

**C. Testimony of Robert Annear, Ph.D., Regarding Chemistry Topics**

Diamond X moves to exclude Dr. Annear from offering expert opinion on chemistry—specifically those opinions reflected in Sections 2.2.2, 2.2.3, and 2.2.4 of his Rebuttal Report. (ECF No. 340 at 15.) ARCO responds that it does not intend to offer Dr. Annear's opinions as reflected in those sections of his Rebuttal Report, making this motion moot. (ECF No. 344 at 9.) Diamond X's motion is therefore denied as moot.

**D. Witness Britt Jones**

Diamond X moves to exclude the testimony of Britt Jones at trial "because ARCO failed to identify her in its initial and supplemental disclosures as required by the Federal Rules of Civil Procedure." (ECF No. 340 at 17.) ARCO, however, points out that it disclosed Britt Jones as a witness in its Third Supplemental Rule 26(a)(1) Disclosures

served on January 5, 2018. (ECF No. 344 at 9.) While ARCO did not attach any exhibits to support this contention, the Court assumes there is no dispute as to whether Britt Jones was disclosed in ARCO's Third Supplemental Disclosures.  Accordingly, Diamond X's motion is denied without prejudice; Diamond X may re-raise this issue in the event ARCO's representation is not supported by its Third Supplemental Disclosures.

### E. Evidence Regarding Viability of Diamond X's Uncompleted Development Efforts

Diamond X moves to exclude evidence or argument "concerning the viability of uncompleted efforts to develop [the] River Ranch" because it is irrelevant to calculation of lost use damages, which are based on the lost use rental value during the time Diamond X was unable to use the River Ranch because of contamination. (ECF No. 340 at 18-19.)  Diamond X states that to determine fair market value, one must determine the highest and best use of the land.  (*Id.* at 19.)  ARCO counters that the "highest and best use" principle applies only to determining just compensation in eminent domain cases. (ECF No. 344 at 11 (citing *City of Las Vegas v. Bustos*, 75 P.3d 351, 352 (Nev. 2003)).) The Court agrees with ARCO and finds that the "highest and best use" principle is "but one factor to be considered in ascertaining [a] property's fair market value." *Tahoe Highlander v. Westside Fed. Sav. & Loan Ass'n*, 588 P.2d 1022, 1024 (Nev. 1979).  Thus, "[e]vidence of historical or current uses of the property [ ]including prior efforts to develop or market the property" and hypothetical future uses are relevant to determining the fair market and rental values of the River Ranch, since those values are affected in part by "whether the property has legal access rights and existing or readily available infrastructure or utilities."  (ECF No. 344 at 12.)  Moreover, the Court agrees with ARCO that "[e]vidence of prior development and marketing efforts [ ] is relevant to undermine Diamond X's assertion that but-for contamination from the Leviathan Mine, it would be ranching the property to this day" and that this evidence actually demonstrates that Diamond X's "primary focus has been on developing or selling the property for a profit." (*Id.*)

1    The Court therefore denies this motion.

2    **F. Dr. Eugenia Larmore's Opinions**

3    Diamond X raises two primary grounds to exclude the expert testimony of Dr.

4    Eugene Larmore.[1]  First, Diamond X argues that Section 1 of her report should be

5    excluded for four reasons: (1) she is not a licensed appraiser in the state of Nevada; (2)

6    she is not qualified to render the opinions contained in Section 1; (3) she "speculates as

7    to which types of ground leases Diamond X could enter into with respect to [the] River

8    Ranch that would not be impacted by contamination"; and 4) her testimony is duplicative

9    of ARCO's appraisal expert, Lyn Norberg. (ECF No. 340 at 20-24.)  Diamond X also

10   moves to exclude Section 2 of Dr. Larmore's report, entitled "Estimate of Economic

11   Damages," because she is not an appraiser or a land development expert. (*Id.* at 22-23.)

12   The Court agrees with Diamond X that Dr. Larmore is not qualified to render certain

13   opinions in Section 1 of her report but disagrees as to its remaining arguments concerning

14   Sections 1 and 2.

15   *i.    Section 1 of Dr. Larmore's Report*

16   Diamond X points out that Dr. Larmore is not a Certified General Real Estate

17   Appraiser and does not have a license to act as an appraiser in the state of Nevada. (ECF

18   No. 340 at 20-21.)  The Court finds the contention that an appraiser must be licensed to

19   render an expert opinion to be unpersuasive. However, the Court agrees that Dr.

20   Larmore, as an economist, is not qualified to render the opinions in Section 1, Part 2,

21   Subsections A through F. (ECF No. 340-15 at 7-12.)  While Dr. Larmore states that

22   Section 1 is meant to critique Dr. Bell's report through analysis of economic damages and

23   asset valuation (*id.* at 6), this part of Section 1 involves a critique of Dr. Bell's selection of

24   comparable properties, which is inherently an appraisal and not an economic

25   methodology.  In fact, Dr. Larmore's report states that she was not giving an opinion as

27   [1]Eugenia Larmore, Ph.D, is an economist specializing in "financial, fiscal impact
28   and economic impact analyses dealing with real estate developments and the gaming
     industry." (ECF No. 340-15 at 5.)

to Dr. Bell's appraisal methodology. (*Id.*) Therefore, the Court finds that Section 1, Part 2, subsections A through F's use of comparables to critique Dr. Bell's appraisal of the River Ranch is inadmissible, and the Court grants Diamond X's motion as to this issue.

Diamond X also argues that Dr. Larmore speculates as to potential ground leases for the River Ranch. However, the cited portion of her report addresses Dr. Bell's estimate of income earned from ground leases. (ECF No. 340-15 at 18.) One example Dr. Bell uses is ground leases for solar energy purposes. Dr. Larmore cites and responds to this example. She does not simply state that Diamond X could have used the land for solar energy; she is responding to Dr. Bell's reliance on a ground lease for solar energy as a comparable. Diamond X's interpretation of Dr. Larmore's testimony is taken out of context, and the Court denies the motion as to this issue.

Finally, Diamond X argues that Dr. Larmore's opinions in Section 1 are "entirely cumulative of ARCO's appraisal expert, Lyn Norberg." (ECF No. 340 at 23.) The Court is unable to determine whether this testimony is duplicative or cumulative until Norberg testifies at trial. The Court therefore denies Diamond X's motion as to this issue without prejudice.

### ii. Section 2 of Dr. Larmore's Report

Diamond X argues that Dr. Larmore is not qualified to opine about Diamond X's loss of use damages because those damages measure the fair rental value of the property along with scenarios of its use and that this measure requires the expertise of an appraiser. (ECF No. 340 at 22.) It adds that Dr. Larmore is not qualified to dismiss residential development of the River Ranch as a potential use for valuation of damages or opine as to the potential uses for the River Ranch because she is not a land development expert. (*Id.* at 23.) ARCO responds that Section 2 of Dr. Larmore's report describes her application of economic damages methodology to Diamond X's lost use damages. (ECF No. 344 at 16.) Specifically, she calculated the "but for" net income by looking at the historical and planned uses for the River Ranch and the income that may have been generated. (*Id.*) In doing so, Dr. Larmore considered three scenarios: (1)

continuation of Diamond X's personal agricultural and recreational uses; (2) leasing of grazing rights; and (3) residential development of the River Ranch. (*Id.*)  Dr. Larmore rejected the third scenario based on the practice of economists not to use a hypothetical example when actual information exists. (*Id.* at 17.)  The Court finds that this analysis falls within Dr. Larmore's area of expertise as an economist specializing in fiscal impact analyses of real estate developments and economic damages.  The Court therefore denies Diamond X's motion as to Section 2 of Dr. Larmore's report.

### G.  Evidence of Prior Appraisals and Testimony of Lee Smith

Diamond X moves to exclude any purported expert testimony of Lee Smith, an appraiser, who ARCO did not designate as an expert and to exclude Smith's "outdated appraisals" of the River Ranch (Trial Exhibits 1073, 1074, 1076, 1080, 1095 ("the Smith Appraisals")). (ECF No. 340 at 24.)  Diamond X posits that as a lay witness, his appraisal opinions are "off-limits," and also that the Smith Appraisals are inadmissible hearsay. (*Id.* at 24-25.)  ARCO responds in relevant part that the Smith appraisals are not hearsay because they fall under the "opposing party statement" exception. (ECF No. 344 at 20.)  Specifically, ARCO points to Fed. R. Evid. 801(d)(2)(C), which exempts statements offered against an opposing party and made by a person whom the party "authorized to make a statement on the subject." (*Id.*)  ARCO states that it plans to use the Smith Appraisals against Diamond X, specifically to undermine Dr. Bell's valuation of the River Ranch, and that the content of the Smith Appraisals was made by an individual "commissioned and paid (i.e., authorized) by the principals of Diamond X to make a professional statement on the value of the River Ranch." (*Id.*)

The Court agrees with ARCO.  Smith may testify as a lay witness and present the Smith Appraisals under this exception. The Court therefore denies Diamond X's motion as to the Smith Appraisals.

### H.  Diamond X Financial Statements and Tax Returns, and the Testimony of Randal Kuckenmeister

Diamond X moves to exclude various financial statements and tax returns from Diamond X and the Park family on the basis that "(1) the financial documents are irrelevant and introducing them would be prejudicial to Diamond X and the Park family; (2) introducing the financial documents into evidence would violate the privacy of the Park family; (3) the financial documents reveal Diamond X's trade secret information." (ECF No. 340 at 25.) ARCO argues that the information in the financial statements and tax returns only show Diamond X's assets, income, expenses, yearly earnings, and its members. (ECF No. 344 at 22.) ARCO contends these materials contain evidence of the River Ranch's values that Diamond X reported to the IRS, which is relevant because Diamond X intends to present evidence at trial that the River Ranch's value was damaged by 9 percent each year and that the market value of the River Ranch is over $45 million, and the financial statements show that the property was valued around $2 million in 2013. (*Id.* at 21.) The Court agrees with ARCO and will admit evidence relating to the River Ranch's values as stated in these financial documents.

As for Kuckenmeister, Diamond X's accountant, Diamond X argues that his testimony is not needed if Diamond X's financial statements and tax returns are excluded. (ECF No. 340 at 27.) ARCO contends that his testimony may be necessary to authenticate the company's tax returns and financial statements, and his testimony may be relevant because of his communications with Bruce and David Park regarding their application to the Nevada Gaming Control Board. (ECF No. 344 at 22.) In particular, the Parks allegedly told Kuckenmeister to value each of their 50 percent shares in Diamond X at roughly $4 million. This number purportedly comprises Diamond X's real property and included the River Ranch, further undermining that the River Ranch's market value was $45 million. The Court agrees with ARCO that Kuckenmeister's testimony may be admitted to authenticate the financial documents that evidence the River Ranch's values and to offer evidence of communications relating to the Parks' representation of Diamond X's value to the Nevada Gaming Control Board.

///

In sum, the Court finds that the probative value of evidence relating to the River Ranch's values outweighs any potential harm of disclosure to Diamond X itself or the Park family.  Moreover, Diamond X has not actually identified what information in this evidence is private or what may constitute trade secret information.  Regardless, the Court directs the parties to redact personal identifiable information and information unrelated to the River Ranch's values from financial documents before they are admitted.  Therefore, the Court denies Diamond X's motion as to financial documents and Kuckenmeister's testimony as they relate to the River Ranch's values.

### I. Prior or Pending Disputes or Litigation Involving the Park Family or Plaintiffs

Diamond X moves to exclude ARCO from "introducing evidence of prior or pending disputes, litigation or claims involving the Park family, Diamond X, Park Livestock Company, or any of the Park family's companies." (ECF No. 340 at 27.)  Diamond X goes onto identify three specific disputes. (*Id.*)  ARCO concedes that it will not introduce evidence regarding two of the disputes but seeks to introduce evidence regarding the third involving disputes with the United States Forest Service ("USFS") about the scope and extent of Diamond X's grazing rights. (ECF No. 340 at 27; ECF No. 344 at 23.)

Diamond X argues that the introduction of the grazing disputes serves no probative value and would confuse or mislead the jury. (ECF No. 340 at 27-28.)  ARCO responds that these disputes are relevant because they relate to "grazing rights owned by the plaintiff in this lawsuit for use in connection with the property at issue in this lawsuit," and these disputes undermine Diamond X's contention that it stopped ranching on the River Ranch because of contamination from the Leviathan Mine. (ECF No. 344 at 23.)  The Court agrees with ARCO that these disputes are relevant because they tend to make a fact of consequence—the cause of impaired land use on the River Ranch for agricultural purposes —more or less probable.

The Court therefore grants this motion as it relates to the first and second dispute but denies it as it relates to disputes with the USFS regarding grazing rights.

## J. Cumulative Witnesses

Diamond X moves to exclude cumulative witness testimony under Fed. R. Evid. 403—specifically, five witnesses that ARCO has identified as intending to call to testify regarding environmental investigation and remediation efforts as well as environmental conditions at the Leviathan Mine and in the downstream watershed. (ECF No. 340 at 28.) Because ARCO presented two individuals—Marc Lombardi and Brian Johnson—as Rule 30(b)(6) designees, Diamond X argues that the other five witnesses—Anthony R. Brown, Roy Thun, Paul Deutsch, Joseph Gonzalez and Britt Jones (ECF No. 344 at 24)—are unnecessarily cumulative and would testify on the same topics the two designees covered. (ECF No. 340 at 28.) ARCO points out, however, that whether there is potential overlap between these witnesses is a question best left for trial. (ECF No. 344 at 24.) The Court agrees and will deny this motion without prejudice.

## V. ARCO'S MOTION IN LIMINE (ECF No. 339)
### A. Evidence of Tort Liability, Injury, or Damages Outside the Applicable Limitations Period

ARCO argues that no evidence of liability, injury, or damages occurring outside the applicable statutory limitations period should be presented to the jury. (ECF No. 339 at 4.) In particular, ARCO contends that "Diamond X must prove [ARCO's] acts, omissions, or breach of a duty of care during the limitations period caused it harm during that period," and therefore "Diamond X's window to satisfy each element of its claims . . . is confined to that period." (ECF No. 339 at 4.) Diamond X points out that the case law relied on by ARCO "only applies to a generic limit on *damages*, not evidence." (ECF No. 346 at 6 n.1 (citing *Skokomish Indian Tribe v. United States*, 410 F.3d 506, 518 (9th Cir. 2005)) (emphasis added).) The Court agrees with Diamond X.

Pre-limitations period evidence regarding ARCO's conduct and any pre-existing injury may demonstrate the elements of breach of duty or causation for damages incurred by Diamond X during the limitations period. *See, e.g., Whittaker Corp. v. Execuair Corp.*, 736 F.2d 1341, 1347 (9th Cir. 1984) ("[e]vidence of events . . . which cannot be the subject

of a suit by virtue of a statute of limitations bar may be introduced . . . to establish a course of conduct"). While this does not categorically mean all pre-limitations evidence of ARCO's conduct or lack therefore is relevant, the Court cannot categorically exclude all pre-limitations evidence concerning ARCO's conduct or Diamond X's injury and instead must evaluate how far the conduct and injury preceded the limitations period and whether that evidence tends to make an element of one of Diamond X's tort claims more probable. The Court therefore denies this motion as to the request to exclude all evidence of tort liability, such as ARCO's conduct and Diamond X's injury during the pre-limitations period, but grants it insofar as ARCO seeks to exclude all evidence of damages incurred during the pre-limitations period.

ARCO also argues that pre-limitations period evidence should not be offered in support of an award of punitive damages. (ECF No. 339 at 5.) ARCO points out that under the Nevada Model Jury Instructions, a jury "may award punitive damages against the defendant only if plaintiff proves by clear and convincing evidence that the wrongful conduct upon which [it] base[s] [its] finding of liability for compensatory damages was engaged in with fraud, oppression or malice on the part of the defendant." Nevada Jury Instructions (Civil), 12PD.1 (2011). "Rule 42(b) of the Federal Rules of Civil Procedure confers broad discretion upon the district court to bifurcate a trial, thereby deferring costly and possibly unnecessary proceedings." *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1021 (9th Cir. 2004) (quoting *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002)). Given the complexities of the issues relating to Diamond X's continuing tort claims and the fact that the jury may not find liability, the Court determines that bifurcation is consistent with Rule 42(b)'s purposes of convenience, avoidance of prejudice, and efficient use of the Court's time. *See* Fed. R. Civ. P. 42(b) ("For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues…"). The Court therefore agrees with ARCO that the jury must first find that ARCO is liable for compensatory damages before it may hear evidence and make a decision as to whether an award of punitive damages is

warranted.[2]  Thus, pre-limitations period evidence that is offered to support Diamond X's

request for punitive damages will be excluded during the liability phase of the jury trial.

In sum, ARCO's motion is denied to the extent pre-limitations period evidence is

offered to establish liability; it is granted to the extend pre-limitations period evidence is

offered to support damages.  As to whether a particular item or category of evidence is

probative of liability or damages, the Court will need to assess its relevance in the context

of trial.

## B. Evidence of Unrecoverable Categories of Tort Damages

ARCO seeks to exclude evidence and argument regarding the following categories

of damages that it contends Diamond X cannot recover as a matter of law: diminution in

value; damages to restore the River Ranch to its "original condition"; damages to replace

Diamond X's water rights; and future damages. (ECF No. 339 at 8-10.)

### i.    Diminution in Value Damages

The Court's prior order makes it clear that "diminution in value damages are not

available to Diamond X." (ECF No. 300 at 17.)   Therefore, evidence and argument

concerning these damages are excluded and the motion is granted as to this issue.

### ii.    Damages to Restore Property to Original Condition

ARCO moves to exclude "evidence of cleanup costs that Diamond X contends are

needed to restore the [River Ranch] to its pre-tort condition—i.e., damages to address all

contamination deposited since the early 1950s."[3]  (ECF No. 339 at 8.)  As to the irrigated

---

[2]Nevada law also provides for two separate phases of a jury trial when punitive damages are at issue. *See* NRS § 42.005(3) ("If punitive damages are claimed pursuant to this section, the trier of fact shall make a finding of whether such damages will be assessed" and "[i]f such damages are to be assessed, a subsequent proceeding must be conducted before the same trier of fact to determine the amount of such damages to be assessed").

[3]According to ARCO, this evidence includes Dr. Dagdigian's opinion that it would cost $16,002,821 to $24,077,531 to "remediate all soil contamination on irrigated portions of the property" because "all soil contaminated by pre-2007  irrigations needs to be removed" as it is "a continuing source of future contaminate spreading and . . . cleanup of soil contaminated by migration of arsenic during the limitations period cannot occur

17

portions of the River Ranch, ARCO argues that Diamond X may, instead, collect only on the costs to remediate incremental increases of contamination that occurred during the limitations period, which is $447,636 per year. (*Id.* at 8-9 (citing ECF No. 311-2).)[4]

The Court's previous order stated that "Diamond X is limited to damages incurred during the relevant limitations period prior to commencement of this action." (ECF No. 300 at 17.) The Court further observed that although "Diamond X . . . contends that it may recover the costs of abatement and restoration for all past contamination . . . the Court finds Diamond X's recovery is limited to *harm* resulting from any contamination of the [River Ranch] caused by the purported releases of AMD from the Mine or any increase in already existing contamination that occurred during the limitations period." (*Id.* (emphasis added).) In other words, Diamond X would have to show liability—releases of AMD or any increase in the existing contamination—during the limitations period. Assuming Diamond X can establish liability, Diamond X would then be entitled to damages incurred during the limitations period for lost use of the River Ranch. The Court therefore grants ARCO's motion as to this issue. Diamond X may only present evidence and argument relating to damages incurred during the limitations period.[5]

### iii. Damages for Replacement of Diamond X's Water Rights

ARCO moves to exclude evidence of damages for replacement of Diamond X's Bryant Creek water rights because "[d]amages for full replacement of water rights are permanent in nature (they represent the cost to return Bryant Creek water to its pre-tort condition), and thus are not recoverable under a continuing misappropriation or other

---

without removal of the previously contaminated soil present above or adjacent to it." (ECF No. 339 at 8 (citing ECF Nos. 242, 311).)

[4]ARCO does not seek to exclude Dr. Dagdigian's opinion as to the costs to remediate existing contamination on the floodplain parcels (i.e., those abutting Bryant Creek). (ECF No. 339 at 9.)

[5]This does not mean that Diamond X cannot present evidence of pre-existing contamination to establish liability. *See* discussion *supra* section V(A).

continuing tort theory."[6] (ECF No. 339 at 9 (citing ECF No. 300 at 17).) Diamond X responds that the proposed remedies "are designed to abate a continuing tort." (ECF No. 346 at 14.) However, the relevant inquiry regarding damages for the continuing tort of misappropriation of water rights is loss of use of one's water rights during the limitations period, including increased contamination that interfered with enjoyment of those water rights during the limitations period. Diamond X's argument conflates liability for continuing torts, which involves an evaluation of whether the harm is reasonably abatable, with damages for continuing torts, which involves damages for loss use. The Court therefore grants ARCO's motion on this issue.

### iv.    Future Damages

ARCO moves to exclude evidence of "damages for addressing speculative future contamination of Diamond X's soil and water, because future damages are not recoverable as a matter of law for continuing tort claims." (ECF No. 339 at 10.) Diamond X argues that evidence of continuing operation and maintenance costs to abate the continuing nuisance and trespass are "an essential component of the remediation program."[7] (ECF No. 346 at 14-15.) Again, this is irrelevant to the continuing tort claims. *See* discussion *supra* Sect. V(B)(iii). The Court's prior order made clear that recovery of damages was limited to the limitations period. (*See* ECF No. 300 at 15-17.) The Court therefore agrees with ARCO and finds that evidence of future damages is irrelevant to Diamond X's continuing tort claims. ARCO's motion is granted as to this issue.

---

[6]More specifically, this evidence includes Anderson's opinions (1) to secure replacement underground water rights and drill new wells for $2,930,000 to $3,442,000 and (2) construct a water treatment system for $2,732,445. (ECF No. 339 at 9.)

[7]Diamond X states that if it is not allowed to seek operation and maintenance costs for future remediation it "will be back in court bringing multiple successive actions for damages from new contamination." (ECF No. 346 at 15.) Yet, the case it relies on makes clear that continuing torts require successive actions if they continue past the action's commencement date, and the only exception is where "it is improbable as a practical matter that the nuisance can or will be abated." *Capogeannis v. Superior Ct. of Santa Clara Cty.*, 12 Cal. App. 4th 668, 677 (Cal. Ct. App. 1993). However, Diamond X has proposed an abatement program, demonstrating that the nuisance may be abated.

## C. Evidence Concerning CERCLA Claims

ARCO moves to preclude "introduction of evidence before the jury that pertains only to the parties' CERCLA claims." (ECF No. 339 at 10.)  Specifically, ARCO identifies the following categories: certain evidence of historical mining operations, estimated future costs for a CERCLA cleanup, evidence in support of CERCLA's natural resource damages ("NRD"), and relitigation of issues decided in the Court's previous order. (ECF No. 339 at 11-13.)

### i.    Historical Mining Operations

ARCO seeks to exclude the following evidence: (1) videotaped deposition designations of Richard Krablin, Jack Dieringer, and Thomas Trelease; and (2) testimony of Diamond X's expert Ronald R. Cohen and related exhibits. (ECF No. 339 at 11.) Diamond X generally responds that the testimony of these witnesses is relevant to establish a pattern of continuing conduct for purposes of punitive damages and to establish the elements of the original torts, such as the "original wrongful conduct that resulted in the continuing nuisance and trespass." (ECF No. 346 at 16.)  First and foremost, any testimony that goes to punitive damages will be excluded during the liability phase of the jury trial.  *See* discussion *supra* Section V(A).  Second, the Court agrees with Diamond X that testimony that is probative of the elements of the tort claims is admissible.  Take for example, Richard Krablin, who is ARCO's designated Rule 30(b)(6) witness.    Diamond X contends that Krablin provided testimony about pollution downstream from the Mine, historical mine waste disposal practices, measures taken to control contamination released from the Mine, the history of operation, management and control of the Mine, as well as ARCO and Anaconda's—ARCO's predecessor-in-interest—communications with the owners of the River Ranch. (ECF No. 346 at 16.)  His cited testimony appears relevant background information that the jury should hear in order to understand the basis for the tort claims and appears probative of the elements of the tort claims.

///

In sum, ARCO's motion is granted to the extent the identified testimony is offered to establish a pattern of continuing conduct for purposes of punitive damages and is denied to the extent the testimony is relevant to establish liability for the continuing torts.

## ii. Estimated Future Costs of a CERCLA cleanup

ARCO argues that the "cost of future CERCLA remedial action required by EPA or NDEP on the [River Ranch] . . . is relevant only to equitable allocation as decided by the Court," and that if such evidence were presented to the jury it poses Rule 403 concerns. (ECF No. 339 at 12.) Diamond X counters that ARCO has failed to specify what evidence it is actually seeking to exclude and that the "cost to remediate the [River Ranch] to an extent necessary to allow for unrestricted use . . . represents an allowable measure of common law damages." (ECF No. 346 at 17.) The Court disagrees. For Diamond X's continuing tort claims, damages may be recovered only for injuries occurring during the limitations period. Thus, future response costs are irrelevant.

The Court therefore grants ARCO's motion as to this issue.

## iii. NRDs

ARCO posits that Diamond X plans to introduce evidence and argument on NRDs, including ongoing and outstanding NRD claims by CERCLA trustees.[8] (ECF No. 339 at 13.) Diamond X responds that it is not seeking NRDs, is uncertain "whether ARCO is seeking the exclusion of documents that may be used for another purpose," and states that many NRD-related documents "are simply technical reports [and] relevant expert and percipient witnesses" offered to prove causation and show ARCO's conduct caused the release of AMD that "injured the environment." (ECF No. 346 at 17.) ARCO did not point to specific evidence, and it is not clear that certain NRD-related documents or testimony

---

[8]Responsible parties under CERCLA may be liable for NRDS, which are "damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release." 42 U.S.C. § 9607(a)(4)(C). NRDs are distinct from response costs because they can be assessed and recovered only by CERCLA "trustees." *Id.* § 9607(f)(1). Moreover, it is unclear whether private parties such as Diamond X have standing to recover NRDs. *See Burbank Envtl. Litig.*, 42 F. Supp. 2d 976, 980-81 (C.D. Cal. 2006).

would be irrelevant to proving elements of Diamond X's tort claims. The Court therefore denies ARCO's motion as to this issue without prejudice.

### iv. Relitigation of Issues Decided in Court's Previous Order

ARCO argues that Diamond X should not be permitted to introduce evidence to the jury or the Court regarding specific holdings in the Court's prior order—these appear to relate specifically to ARCO's counterclaims and third-party claims against both Diamond X and Park Livestock—in order to relitigate already determined issues. (*See* ECF No. 339 at 13-14 (quoting ECF No. 300 at 22, 31, 33-35).) Diamond X contends that ARCO's request is "vague, overbroad, and not actionable on a motion in limine." (ECF No. 346 at 17 (citing *Mims v. Fed. Express Corp.*, No. cv 13-03947, 2015 WL 12711651, at \***1-**\*2 (C.D. Cal. Jan. 15, 2015)).) The Court disagrees insofar as ARCO has quoted specific language in the prior order. Those specific holdings that ARCO has identified may not be relitigated and evidence that supports these holdings is excluded. ARCO's motion is therefore granted as to this issue.

### D. Improper Evidence of Diamond X's CERCLA Response Costs

ARCO moves to preclude "all evidence of Diamond X's alleged CERCLA response costs incurred (1) after February 2012, or (2) prior to February 2012 and not previously disclosed." (ECF No. 339 at 14.) As for category (1), ARCO relies on the Court's prior order finding that response costs incurred by Diamond X after February 2012 are not recoverable.[9] (*Id.* at 14 (citing ECF No. 300 at 28).) Diamond X, however, contends that these response costs—presumably from February 2012 to October 2013 (the time this action commenced)—are relevant to compensatory damages that the jury may award for the continuing tort claims. (*See* ECF No. 346 at 17-18.) The Court disagrees. Only lost use damages are recoverable for Diamond X's tort claims based on the Court's previous

///

---

[9]Diamond X states that it "does not seek to re-litigate the Court's finding that post-February 2012 response costs are not recoverable under CERCLA section 107." (ECF No. 346 at 17-18.)

order, not the investigatory costs Diamond X incurred during that time. These damages will be excluded during the jury phase of the trial.

Diamond X also contends that response costs incurred after February are relevant to CERCLA allocation under the Gore factors, specifically the degree of care exercised by the parties in investigating hazardous substance on River Ranch. (*See id.* at 18 (citing *TDY Holdings, LLC v United States*, 885 F.3d 1142, 1146 n.1 (9th Cir. 2018)).) Because the Court is not limited to the Gore factors and has discretion to consider "such equitable factors as it finds appropriate," *Boeing Co. v. Cascade Corp.*, 207 F.3d 1177, 1187 (9th Cir. 2000) (quoting 42 U.S.C. 9613(f)(1)), the Court defers ruling on this evidence until the CERCLA portion of the trial.

As for category (2), ARCO contends that Diamond X's supplemental disclosures included "Past Response Costs . . . in excess of $500,000.00, including but not limited to the costs of investigating, characterizing, and assessing the contamination on Diamond X property," which correspond to the historical investigation costs Dr. Dagdigian identified in his initial report. (ECF No. 339 at 15 (citing ECF No. 339-4).) However, ARCO states that only $4,030.05 of such costs were actually incurred before February 2012, and it avers that no other evidence was provided. (*Id.*) Diamond X represents that it did disclose other costs to ARCO. (ECF No. 346 at 18.) The Court takes Diamond X at its word—that other response costs incurred before February 2012 were disclosed—and denies the motion without prejudice.

In sum, the Court grants the motion with respect to response costs in category (1) as they relate to the jury trial and defer its ruling as to the bench trial. The Court denies the motion without prejudice as to response costs in category (2).

### E. Evidence of Damages for Restitution and Benefits Conferred

ARCO moves to exclude all evidence of restitutionary damages on the basis that Diamond X's Rule 26(a)(1) initial disclosures did not identify this category of damages, and its supplemental disclosures state only that these damages will be "establish[ed] at trial through, among other things, expert testimony." (ECF No. 339 at 15 (citing ECF No.

339-4 at 4).)   Diamond X argues that ARCO was put on notice that it would seek restitutionary damages at trial; ARCO has produced evidence that monetizes the value it received from its mining operations and Diamond X is "entitled to explain this value in today's dollar by way of judicial notice of inflation rates from the [United States] Bureau of Labor Statistics"; any failure to disclose these damages was harmless; and the "value that Anaconda realized from its mining operations at Leviathan while underfunding environmental protection is evidence in support of punitive damages." (ECF No. 346 at 19-20.)

Rule 26(a)(1)(A)(iii) requires the disclosure of "a computation of each category of damages claimed by the disclosing party."  Rule 26(e)(1)(A) requires disclosing parties to supplement prior disclosures that are "incomplete or incorrect" in a "timely manner." Failure to comply with these rules results in the exclusion of this information at trial. Rule 37(c)(1); *see also Hoffman v. Constr. Protective Serv., Inc.*, 541 F.3d 1175, 1179 (9th Cir. 2008).   Diamond X clearly violated Rule 26 by failing to disclose a computation of restitutionary damages in its initial disclosures as well as its supplemental disclosures. While Diamond X's supplemental disclosure may put ARCO on notice that Diamond X seeks restitution, Diamond X's failure to provide a computation of such damages violates Rule 26 and smacks of an attempted trial by ambush.  The Court therefore exercises its discretion under Rule 37 to exclude any evidence of restitutionary damages.   ARCO's motion is granted.

### F.  Evidence Concerning Sheep Deaths in 2013

ARCO moves to exclude any evidence regarding an alleged incident in 2013 where 30 sheep and lambs that grazed on the River Ranch died. (ECF No. 339 at 16.) Specifically, it moves to exclude the testimony of two of Diamond X's experts, Dr. Dagdigian and Dr. Ryer-Powder, and one fact witness, Ted Borda (the owner of the sheep), as to the cause of the animals' deaths.  The Court finds that evidence of sheep deaths in the summer of 2013 is irrelevant, unreliable, and that any probative value of the incident is outweighed by the likelihood of confusing or misleading the jury.

While the sheep died during the limitations period, testimony regarding their deaths does not appear to be relevant to a fact of consequence in any of Diamond X's tort claims. The parties do not dispute that there are elevated concentrations of arsenic on the River Ranch, and the sheep were not tested for arsenic levels such that Diamond X could rely on this event to show an increase in contamination across the River Ranch. To the extent Diamond X contends this incident is relevant to demonstrate that arsenic spread from soil to plants during the limitations period, the Court finds that the lay testimony of Borda and thus the subsequent expert opinions on the sheep's cause of death are unreliable. Dr. Dagdigian,[10] Dr. Ryer-Powder, and ARCO's expert Dr. Johnson all rely on Borda's declaration relating to the symptoms Borda observed in his sheep before they died. Borda had grazed his sheep on the River Ranch without permission from the Park family. (ECF No. 339-7 at ¶¶ 10-11.) The sheep's locations were not precisely pinpointed—although Borda identified a general area and pathway—and the plant and soil the sheep ingested were not tested for arsenic levels. (*See id.* at ¶¶ 9-16; *see also id.* at 11.) Moreover, all Borda observed with regards to the sheep's symptoms was that they had "breathing difficulties" and "breathing problems" before dying. (*Id.* at ¶ 14-15.) Lay witness testimony is limited to testimony "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue;

---

[10]Even if Borda's declaration was reliable, Dr. Dagdigian is not qualified to provide an expert opinion on the cause of the sheep's deaths. In his expert report, Dr. Dagdigian states, "I have concluded that the Borda sheep die-off is likely the result of arsenic poisoning emanating from the arsenic impacted land on the River Ranch." (ECF No. 242 at 37.) Dr. Dagdigian relied on Borda's declaration—which states that the sheep died over a three-week period after grazing on the River Ranch and suggests the cause of death was heavy-metals poisoning—as well as the online Merck Veterinary Manual to reach his conclusion. (ECF No. 339 at 16-17.) ARCO argues that this testimony should be excluded because Dr. Dagdigian is not qualified to provide an expert opinion on what caused the sheep's deaths because he is a chemist and is neither a toxicologist nor a veterinary toxicologist. (*Id.* at 16.) As noted previously, an expert's area of competence must match the subject matter of his testimony. *See Chang*, 207 F.3d at 1172-73. While Dr. Dagdigian may be well-versed in the chemical properties of arsenic and the history and locations of arsenic-contaminated soil on the River Ranch, testifying as an expert as to cause of death requires a different form of expertise, such as that of a toxicologist.

and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. While a lay witness such as Borda may have perceived a particular "symptom" in the sheep, he does not have specialized knowledge within the scope of Rule 702 to identify the cause of death of the sheep, and the catch-all "breathing problems" is not particular enough to base subsequent expert opinions on.

Importantly, neither party's experts tested the sheep or the specific plants and soil they ate, which is an element of differential diagnosis of a patient's symptoms. "Differential diagnosis is the determination of which of two or more diseases with similar symptoms is the one from which the patient is suffering, by a systematic comparison and contrasting of the clinical findings." *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1057 (9th Cir. 2003) (internal quotation marks and citation omitted). Differential diagnosis is a "standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated[] [and] [a] reliable different diagnosis typically, though not invariably, is performed after physical examinations, the taking of medical histories, and the review of clinical tests, including laboratory tests." *Id.* (internal quotation marks and citation omitted). While differential diagnosis in sheep is likely different from that in humans, indicia of reliability in determining the cause of symptoms include actual physical examination and laboratory tests, neither of which occurred here. The Court therefore finds that Borda's declaration and the expert testimony that relies on it are unreliable.

Finally, the Court finds that the likelihood that testimony and evidence regarding the sheep deaths will confuse or mislead the jury outweighs any probative value it may have to Diamond X's continuing tort claims. Due to the lack of reliability of Borda's declaration for purposes of undergirding the three expert opinions, expert testimony on this incident would focus attention on something that is not material to a fact of consequence in this case.

The Court therefore grants this motion.

**G. Evidence of ARCO's Financial Conditions**

ARCO moves to exclude "all evidence and argument relating to the financial condition of [ARCO], BP, and their affiliates and predecessors during the trial on continuing tort liability and damages, and whether punitive damages are warranted." (ECF No. 339 at 21.) ARCO argues that this evidence should be excluded because it is not relevant to compensatory damages and pertains only to punitive damages. (*Id.* at 21-22.) The Court agrees and grants this motion. Evidence of ARCO's financial condition is admissible only during a potential punitive damages phase of the jury trial.

## H. Unrelated Cleanups and Environmental Incidents

ARCO moves to exclude "all evidence or argument concerning: (1) any environmental and/or operational incidents unrelated to the Leviathan Mine involving [ARCO], Anaconda, BP, or any of their subsidiaries or affiliates, including but not limited to the 2010 Deepwater Horizon explosion and oil spill in the Gulf of Mexico; and (2) contamination, regulatory actions, settlements, or remedial efforts at sites other than the Leviathan Mine that are or were owned or operated by [ARCO]." (ECF No. 339 at 22.) ARCO argues that this evidence is irrelevant and would be highly prejudicial—for instance, ARCO gives as an example of Diamond X's use of this information to "attempt to portray [ARCO] as a 'serial polluter,' which would only inflame the jurors' emotions and result in unfair prejudice." (*Id.* at 23.) Diamond X contends that this motion is inconsistent with the use of Dr. Tsuji's expert opinions because she relies on data from five contaminated sites where ARCO is a responsible party. (ECF No. 346 at 27.) However, ARCO is making a specific argument about exclusion of any evidence of ARCO's role in causing contamination at or cleaning up other contaminated sites. By contrast, Dr. Tsuji relied only on data from these sites. The responsible parties at those sites is wholly irrelevant to her methodology; in fact, the tables provided in Dr. Tsuji's report listing the sites she considered do not indicate the responsible parties and only include data about

///

///

///

arsenic contamination (ECF No. 340-11 at 30-32).   The Court therefore grants this motion.[11]

### I.   Authenticity of ARCO's Pre-1998 Exhibits

ARCO moves to have sixteen exhibits admitted pursuant to Fed. R. Evid. 901(b)(8), stating that "Diamond X has refused to stipulate to the authenticity of 16 'Ancient Documents' identified in [ARCO's] exhibit list." (ECF No. 339 at 23.)  Diamond X responds that it "offered to stipulate to the authenticity of ARCO's pre-1998 documents and merely requested that ARCO reciprocally agree to waive its authenticity objections to the pre-1998 documents on Diamond X's exhibit list." (ECF No. 346 at 28.)  Because Diamond X "does not categorically object to deeming pre-1998 documents authentic," the Court grants ARCO's motion.[12]

### J.   Dr. Dagdigian's Opinions and Testimony on the Floodplain Mitigation Channel

ARCO's motion is based on the potential success of Diamond X's objection to Judge Cobb's ruling. (ECF No. 339 at 24.)  Because the Court overruled Diamond X's objection (ECF No. 351), the Court denies this part of ARCO's motion as moot.

## VI.   CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the parties' motions.

The Court therefore grants in part and denies in part ARCO's Motions in Limine (ECF No. 339).

---

[11]In its opposition, Diamond X also argues that two categories of evidence should be deemed related and not excludable. (ECF No. 346 at 27-28.)  However, Diamond X cannot seek to exclude evidence in its response.  Nor did Diamond X raise this issue in its Consolidated Motion in Limine.

[12]To the extent Diamond X requests that its pre-1998 documents be deemed to be authentic, it did not properly raise this issue in its own motion.

The Court further grants in part and denies in part Diamond X's Consolidated Motions in Limine (ECF No. 340).

DATED THIS 8th day of May 2018.

_____
MIRANDA M. DU
UNITED STATES DISTRICT JUDGE